[Cite as *Robinson v. Mercy St. Vincent Med. Ctr.*, 2018-Ohio-2030.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


Alexander Robinson, Jr., by his mother
and next friend Ishonda Pettaway, et al.

      Appellants

v.

Mercy St. Vincent Medical Center, et al.

      Appellee

Court of Appeals No. L-17-1102

Trial Court No. CI0201601962


**DECISION AND JUDGMENT**

Decided: May 25, 2018

* * * * *

Gary W. Osborne and Jack S. Leizerman, for appellants.

John C. Barron and Katherine S. Decker, for appellee
Alphonsus Obayuwana, M.D.

* * * * *

**MAYLE, P.J.**

{¶ 1} Plaintiffs-appellants, Alexander Robinson, Jr., by his mother and next

friend Ishonda Pettaway, Ishonda Pettaway in her individual capacity, and Alexander

Robinson, Sr. (collectively, "Robinson"), appeal the March 31, 2017 judgment of the

Lucas County Court of Common Pleas, denying their motion for a new trial. For the reasons that follow, we affirm, in part, and reverse, in part, the trial court judgment.

## I. Introduction

{¶ 2} Ishonda Pettaway ("Ishonda") and Alexander Robinson, Sr. ("Alexander") are the parents of Alexander Robinson, Jr. ("A.J."). A.J. was born on February 1, 2013, at Mercy St. Vincent Hospital where he was delivered by defendant-appellee, Alphonsus Obayuwana, M.D., an obstetrician. A.J. suffered a severe brachial plexus injury that has left him permanently impaired. At issue in this lawsuit is whether Dr. Obayuwana negligently caused this injury when he delivered A.J.

{¶ 3} The case was tried to a jury from January 17-24, 2017. A number of witnesses testified who were present for the delivery, including Ishonda; Alexander; Ishonda's mother, Shevella Pettaway; Ishonda's cousin, Tierra Brown; Dr. Obayuwana; Thomas Kopp, M.D., an emergency medicine resident who was there to observe the delivery as part of his obstetrics-gynecology rotation; and Colleen Schade, the labor and delivery nurse who cared for Ishonda during A.J.'s delivery. Several medical experts also testified, including Edith Gurewitsch, M.D., an associate professor of obstetrics and gynecology at Johns Hopkins University School of Medicine, retained by Robinson; and Mark Landon, M.D., a professor and chair of the department of obstetrics and gynecology at The Ohio State University College of Medicine, retained by Dr. Obayuwana.

2.

**{¶ 4}** The parties agree that during delivery, A.J.'s shoulder became impacted behind his mother's pubic bone, a complication known as shoulder dystocia, and that the umbilical cord was wrapped twice around his neck. They dispute a number of other facts, however, including which shoulder was impacted and whether Dr. Obayuwana responded appropriately to this obstetric emergency.

**{¶ 5}** Simply stated, Robinson claims that when A.J.'s right shoulder became stuck at Ishonda's pubic bone, Dr. Obayuwana forcefully pulled and tilted the baby's head, permanently damaging the right brachial plexus, the network of nerves that supply movement and sensation to the shoulder down to the hand. This injury has rendered A.J. unable to use his right arm.

**{¶ 6}** Dr. Obayuwana contends that he performed a fourth-degree episiotomy— making an incision from Ishonda's vagina to her rectum—to make enough room to allow him to put his hand into Ishonda's vagina, grab the baby's hand, and pull it through the vagina, freeing the baby's shoulder. This is a maneuver known as a posterior arm extraction. He claims that it was the baby's left shoulder that became impacted, but claims that there was also an impaction of the right shoulder at the sacral promontory—a projection at the end of the spine at the beginning of the formation of the tail bone. He insists that the injury to A.J.'s right brachial plexus occurred because of the natural forces of labor and the impaction at the sacral promontory.

**{¶ 7}** The parties' experts both agree that when faced with a shoulder dystocia, it is a breach of the standard of care for an obstetrician to pull forcefully on the baby's

3.

head, to instruct the mother to continue to push once the shoulder dystocia has been recognized, and to fail to perform maneuvers to free the baby's shoulder. They also agree that performing a fourth-degree episiotomy is not itself a maneuver.

## II. Background

{¶ 8} We briefly summarize the events leading to the delivery as set forth in Ishonda's birth records, admitted at trial as Joint Exhibit A. We then outline the pertinent facts elicited from the parties and their witnesses at trial. Because the issues on appeal are limited, a full recitation of the facts is unnecessary.

### A. Overview of the Labor and Delivery.

{¶ 9} Ishonda Pettaway was 23 years old and 39 weeks pregnant with her second child. She had a history of gestational diabetes. She presented to Mercy St. Vincent Medical Center at 8:53 a.m. on February 1, 2013, for a scheduled induction. When she arrived, she was 50 percent effaced and dilated to five centimeters. Her water was artificially broken at 10:45 a.m. Pitocin was administered beginning at 11:40 a.m. By 2:02 p.m., Ishonda was fully dilated. She was completely effaced at 2:25 p.m. and was prepared for delivery. She began pushing at this time, and Dr. Obayuwana was called to the delivery room. He arrived one minute later. The NICU team was called to the delivery at 2:35 p.m. At that time, it was documented that Ishonda was pushing with contractions. Three minutes later, at 2:38 p.m., A.J. was delivered, weighing nine pounds, seven ounces. Dr. Obayuwana recorded the following delivery note at 3:30 p.m.:

4.

I was called to deliver this patient who was pushing and after a few pushes the head of the baby came out. Patient who had declined epidural anesthesia became very intolerant of the pain that ensued from perineal stretching. She became uncooperative and moved up so far up the bed. With mild-moderate dystocia the baby was delivered after making a generous 4th degree episiotomy. Cord was twice around the neck of the baby x 2 (tight).

### B. The Defense Witnesses' Recollection of the Delivery.

{¶ 10} Dr. Obayuwana testified that he arrived in the delivery room just as Ishonda began to push. He said that Ishonda had declined an epidural and was experiencing significant pain to the point of becoming uncooperative. Dr. Obayuwana described that as A.J.'s head began to emerge from Ishonda's vagina, Ishonda moved up the bed and sat forward onto the baby's head. Ishonda was coaxed back down to the end of the bed and was repositioned. The baby was facing maternal left, and Dr. Obayuwana could feel that the umbilical cord was wrapped twice around the baby's neck, very tightly. He tried to deliver the baby's shoulder, but he met with resistance because A.J.'s anterior, or top, shoulder was stuck at the pubic bone. The baby's face was turning blue.

{¶ 11} Dr. Obayuwana described this as an "emergency times three." He said that he quickly decided to use the scissors to make a fourth degree episiotomy, thereby allowing enough space to insert his hand into Ishonda's vagina. He did so, and could feel

5.

the baby's hand positioned at his chest. Dr. Obayuwana explained that at this point, he performed a posterior arm extraction. He grabbed the baby's right hand and pulled it out, disimpacting the shoulder. The baby's body was delivered at 2:38 p.m. and handed off to the nurses. At 3:30 p.m., Dr. Obayuwana recorded the note in Ishonda's chart.

{¶ 12} Also in the room for the delivery were Dr. Kopp, an emergency medicine resident, and nurse Colleen Schade. Nurse Schade was positioned at Ishonda's left and was holding her left leg during the delivery. Dr. Kopp was standing at the foot of the bed near Dr. Obayuwana's right.

{¶ 13} Both Dr. Kopp and Nurse Schade recalled that Ishonda had a difficult time tolerating the pain of the delivery and they had a hard time keeping her down at the edge of the bed. They said she moved away from the edge of the bed more than once. Nurse Schade did not recall seeing the baby's head make contact with the bed, and Dr. Kopp did not recall the position of the head at the time Ishonda moved up the bed. He did not recall her sitting on her baby's head.

{¶ 14} Dr. Kopp recalled that the baby was facing maternal left and that the cord was wrapped around his neck, but did not recall the baby turning blue. He heard Dr. Obayuwana say "this is no joke," and tell the patient that she needed to push. At Dr. Obayuwana's request, Dr. Kopp handed Dr. Obayuwana the scissors for the episiotomy. Dr. Kopp did not recall seeing Dr. Obayuwana stick his hand into Ishonda's vagina, and Nurse Schade was not in a position where she would have been able to see. Dr. Kopp did

6.

not see Dr. Obayuwana deliver the baby's posterior arm. He did see him pull on the baby's head with his hands.

{¶ 15} Dr. Obayuwana did not inform Dr. Kopp or Nurse Schade that he had encountered a shoulder dystocia. Dr. Kopp recalled thinking that it took longer than normal between the delivery of the head and the rest of the body, but it did not cross his mind that it was a shoulder dystocia. Nurse Schade testified that nurses practice shoulder dystocia drills. Upon learning that there is a shoulder dystocia, they are expected to keep time so they know how much time has passed after the head has been delivered. Nurse Schade was not informed until after the delivery that Dr. Obayuwana had encountered a shoulder dystocia. She estimated that the baby's head and body were delivered within about one minute of another. Dr. Kopp testified that it was "minutes" between delivery of the head and delivery of the body, but he could not be any more specific than that.

## C. Ishonda and Her Family's Testimony.

{¶ 16} Ishonda and her family agreed with the defense witnesses that Ishonda experienced significant pain during labor, but they maintain that she twice asked for an epidural. The first time, they say that she was dissuaded by one of the nurses who suggested Nubaine instead. The second time, she was told that it was too late for an epidural.

{¶ 17} Shevella, Alexander, and Tierra described that they were all positioned to Ishonda's right. When it came time to push, Alexander held Ishonda's right leg, and a nurse held her left leg. They said that when the baby's head emerged, he was facing

7.

Ishonda's right and they could see that the cord was wrapped around his neck twice. Dr. Obayuwana tried to loosen the cord, but it was too tight.

{¶ 18} Dr. Obayuwana called for help. The family could see that the baby was starting to turn blue and purple, and Alexander and Tierra described that at this point, they noticed a change in Dr. Obayuwana's demeanor. He had been calm, but now seemed fearful and panicked. Ishonda's family described that Dr. Obayuwana forcefully pulled on the baby's head and neck to the point that Shevella told him, "you're going to break his neck." They maintained that Dr. Obayuwana told Ishonda to push like her and her baby's lives depended on it. At that point, Shevella moved Alexander out of the way and held her daughter's leg. She told Ishonda that if she did not push, she was going to die. Dr. Obayuwana never directed Ishonda to stop pushing.

{¶ 19} Alexander agreed that Ishonda had moved up the bed, but he denied that she sat on the baby's head. He said that she went up the bed before the baby's head emerged. Tierra maintained that Ishonda had never moved up the bed, and neither Shevella nor Ishonda recalled her doing so. Alexander described that Dr. Obayuwana made a "circular motion" with his right hand around Ishonda's vagina, like he was trying to stretch it to make room for the baby's head to come out. But Alexander, Ishonda, and Tierra disputed that Dr. Obayuwana put his hand inside Ishonda's vagina. Alexander also denied that Dr. Obayuwana used scissors to make an episiotomy—he maintained that Ishonda had torn. Neither Tierra nor Shevella recalled Dr. Obayuwana making an incision.

8.

{¶ 20} When the baby was delivered, he was not crying and had bruises on his body. His arm was limp. Alexander and Ishonda both testified that they asked Dr. Obayuwana about the bruises on the baby and he told them the bruises would go away.

### D. The Experts' Opinions.

### 1. Dr. Gurewitsch

{¶ 21} Dr. Gurewitsch explained that shoulder dystocia occurs when the baby's head is delivered, but the baby's anterior (i.e., top) shoulder becomes impacted at the mother's symphysis pubis. It is dangerous because the umbilical cord can be compressed, preventing the flow of oxygen to the baby. She said that once a shoulder dystocia is recognized, the physician has approximately four minutes to deliver the baby's body. She described a number of maneuvers that may be employed to dislodge the shoulder and safely deliver the baby; a proctoepisiotomy—another term for a fourth-degree episiotomy—is *not* a maneuver. She explained that the doctor cannot just bend the baby's head down, and then up, as would be done in an ordinary delivery because there is a risk of stretching the nerves that control the baby's arm. The baby's head must be kept in line with the spine.

{¶ 22} Dr. Gurewitsch testified that once the physician meets resistance in delivering the baby, he or she must stop and perform maneuvers. He or she should apply no more force than is applied in a normal delivery. If one maneuver does not work, another maneuver should be attempted. She said that it is rare that the baby's shoulder would remain impacted after multiple maneuvers are performed.

9.

{¶ 23} Dr. Gurewitsch explained that the standard of care requires an obstetrician to recognize the occurrence of shoulder dystocia, to limit the amount and direction of traction applied, and to apply one or more maneuvers appropriate for the circumstances. Continued pushing will force the baby's shoulder further into the pelvic bone, increasing risk of injury, so this should be avoided.

{¶ 24} Dr. Gurewitsch was asked to assume that the family was positioned to the right of the mother; the baby was facing the family, so that the right shoulder was anterior; the doctor did not do any of the maneuvers she described; the family said that the doctor became panicked and was pulling on the baby's head excessively; the doctor told the mother to push like the baby's life depends on it; the doctor did not document having performed any maneuvers; and no one in the room witnessed the doctor perform any maneuvers. Under these circumstances, Dr. Gurewitsch opined that the standard of care was not met.

{¶ 25} Dr. Gurewitsch testified that all five of A.J.'s nerve roots were stretched and torn to the point of not conducting, and he has no use of his right arm despite multiple attempts to repair the damage. This is the most severe stretch injury possible. She explained that this type of stretch injury does not occur without the application of force of about 40-50 pounds—about four times the necessary force—and bending of the head 60 degrees away from the effected side. She testified that excessive lateral traction is the only way this injury could have occurred.

10.

{¶ 26} Dr. Gurewitsch was asked to comment on the defense's contentions that (1) the left shoulder was anterior; (2) Dr. Obayuwana reached his right hand in and performed a posterior arm extraction; (3) injury was due to maternal forces of labor and an obstruction at the sacral promontory; and (4) injury resulted when Ishonda moved up the bed during the delivery.

{¶ 27} Dr. Gurewitsch testified that whether the baby's left arm was anterior or posterior, her explanation of the injury is the same: the baby's head was titled more than 60 degrees and the doctor applied excessive force to the head. As to Dr. Obayuwana reaching his hand in, she said that it would be noticeable to observers of the delivery if Dr. Obayuwana reached his hand in to extract the posterior arm. As to the theory that the injury was caused by the maternal forces of labor and an obstruction at the sacral promontory, Dr. Gurewitsch said that this was not biomechanically possible. And as to Dr. Obayuwana's contention that the injury occurred when Ishonda moved up the bed, Dr. Gurewitsch testified that while she had seen laboring mothers move up the bed during delivery, it does not make sense that this caused the injury because the head would have had to have bent over 60 degrees. She was skeptical that the head could have been protruding out enough for this to have happened, and she said that if Ishonda had sat on the baby's head, he probably would not have survived that.

{¶ 28} Dr. Gurewitsch explained that only temporary brachial plexus injury has ever been shown to have resulted from an obstruction at the sacral promontory. There have been no reported cases of a permanent stretch injury to all five nerve roots.

11.

**{¶ 29}** Finally, Dr. Gurewitsch described that certain information should be contained in a delivery note where the physician has encountered a shoulder dystocia, including the time the head is delivered; which shoulder was anterior; and what maneuvers were used. This information does not appear in Dr. Obayuwana's note. Dr. Gurewitsch said that she would expect a physician of Dr. Obayuwana's experience to provide proper documentation, especially given that one of Dr. Obayuwana's duties is to instruct residents.

### 2. Dr. Landon

**{¶ 30}** Dr. Landon did not dispute that there was a shoulder dystocia in this case, but he explained his theory of the cause of A.J.'s brachial plexus injury: that A.J.'s right shoulder became caught at Ishonda's sacral promontory. The baby has to clear the sacral promontory to be delivered vaginally, and this area is a zone of risk for the safe passage of the posterior shoulder. When the posterior shoulder becomes hung up on the sacral promontory, this event occurs before the anterior shoulder becomes hung up on the pubis symphysis. A physician would generally not know until the head is delivered that the posterior shoulder is caught on the sacral promontory.

**{¶ 31}** Dr. Landon testified that the record shows that Dr. Obayuwana made a fourth-degree episiotomy. He agreed that a generous episiotomy is not a maneuver in and of itself to relieve a shoulder dystocia, and he said that there is no reason to do this other than for purposes of performing a posterior arm extraction. Dr. Landon described that if the baby is facing maternal left, the physician would use his or her right arm to do

12.

a posterior arm extraction. If the baby is facing maternal right, the physician's left arm would be used. He testified that the right-sided bruising on the baby is consistent with the baby facing maternal left and Dr. Obayuwana performing a right posterior arm extraction. The right-hand bruising would have resulted when Dr. Obayuwana grasped the baby's hand. Dr. Landon would not expect to see bruising on the right hand if Dr. Obayuwana had simply used great force to pull the baby out.

{¶ 32} Dr. Landon explained that it has been shown that a brachial plexus injury can occur without shoulder dystocia. He said that it cannot simply be concluded that excessive force was used just because there has been a permanent brachial plexus injury. Dr. Landon testified that there is no clear line as to how much force is too much force, and injury can be caused by the force of labor itself. What may severely injure one baby may not injure, or may only mildly injure, another baby. He described this as biologic variability. Dr. Landon was unable to quantitate what role Ishonda moving up the bed played in causing A.J.'s injury, but he opined that it probably did contribute overall.

{¶ 33} Dr. Landon acknowledged that he could not tell only from the records whether Dr. Obayuwana had met the standard of care because the delivery note did not indicate what maneuvers he performed, which way the baby was facing, how much force was applied, and how much time passed between the emergence of the baby's head and delivery of the body. He agreed that it is recommended that all this information be included in the delivery note.

**{¶ 34}** Dr. Landon conceded that if Dr. Obayuwana performed no maneuvers and if he told Ishonda to push like her life depends on it, this would violate the standard of care. It would also violate the standard of care to pull or yank on the baby's head. Dr. Landon agreed that if Dr. Obayuwana did not do a posterior arm extraction, the right shoulder was anterior and became stuck, and Dr. Obayuwana only pulled on the baby's head, it would be more likely than not that this conduct caused the baby's injury. Dr. Landon agreed that in performing a posterior arm extraction, the doctor's hand would be inserted into the vagina up to the wrist. If Dr. Obayuwana performed no maneuvers, then the only way to get the baby out would be to pull hard. Finally, Dr. Landon acknowledged that there is no case reported in the literature where all five nerves have been ripped due to an impaction at the sacral promontory, and that such injury would usually be temporary.

### E. The Jury's Verdict.

**{¶ 35}** The jury rendered a verdict in favor of Dr. Obayuwana. Robinson filed a motion for new trial under Civ.R. 59(A)(9), arguing that the trial court made errors of law at trial in two of its evidentiary rulings. In a judgment journalized on March 31, 2017, the trial court denied Robinson's motion. Robinson appealed and assigns the following errors for our review:

> A. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANTS' REQUEST TO PRESENT REBUTTAL TESTIMONY REGARDING DEFENSE EXPERT'S CLAIM THAT THE BABY'S

14.

RIGHT HAND BRUISING PROVED THAT THE BABY WAS FACING MATERNAL LEFT AT DELIVERY AND ERRED IN DENYING A NEW TRIAL ON THIS ISSUE.

B. THE TRIAL COURT ERRED IN OVERRULING TRIAL COUNSEL'S OBJECTION TO ALLOWING APPELLEE TO TESTIFY REGARDING THREE PRIOR INCIDENTS WHERE HE SAFELY DELIVERED SHOULDER DYSTOCIAS WITHOUT INJURY.

C. THE TRIAL COURT ERRED IN FAILING TO STRIKE DEFENSE EXPERT'S TESTIMONY THAT HE COULD NOT QUANTITATE WHAT ROLE THE MOTHER MOVING UP THE BED PLAYED IN CAUSING THE BABY'S INJURY BUT THAT IT CONTRIBUTED.

### III. Law and Analysis

{¶ 36} Robinson argues that the trial court erred in denying his motion for a new trial under Civ.R. 59(A)(9). He contends that the trial court erred in (1) prohibiting rebuttal evidence pertinent to bruising observed on A.J.'s right hand and wrist; (2) allowing Dr. Obayuwana to testify about three prior instances where he successfully managed shoulder dystocia deliveries without causing injury to the babies; and (3) refusing to strike testimony from Dr. Landon about the effect of Ishonda moving up the bed during delivery.

15.

{¶ 37} The admission of evidence lies within the broad discretion of the trial court and is reviewed for an abuse of discretion. *State v. Patton*, 6th Dist. Lucas No. L-12-1356, 2015-Ohio-1866, ¶ 53. An abuse of discretion connotes that the trial court's attitude in reaching its decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 38} We address Robinson's assignments of error out of order.

### A. The trial court's failure to strike defense expert's testimony.

{¶ 39} In his third assignment of error, Robinson argues that the trial court erred in allowing Dr. Landon to testify that Ishonda moving up the bed played a role in the baby's injury even though he was unable to "quantitate" how much of a role it played. Dr. Obayuwana points out that Robinson failed to raise this objection in his motion for a new trial, and has, therefore, waived the argument for purposes of appeal. We agree with Dr. Obayuwana.

{¶ 40} A litigant's failure to raise an issue before the trial court waives that party's right to raise the issue on appeal. *Estate of Hood v. Rose*, 153 Ohio App.3d 199, 2003-Ohio-3268, 792 N.E.2d 736, ¶ 10 (4th Dist.). While Robinson objected at trial to the admission of Dr. Landon's opinions regarding the effect of Ishonda moving up the bed, he failed to raise this issue in his motion for a new trial. Given that his appeal is based on the denial of that motion, he has therefore waived this argument for purposes of appeal. *See Baugh v. Carver*, 3 Ohio App.3d 139, 142, 444 N.E.2d 58 (1st Dist.1981).

{¶ 41} We find Robinson's third assignment of error not well-taken.

16.

**B. The trial court's decision allowing specific testimony about other deliveries.**

{¶ 42} During Dr. Obayuwana's case-in-chief, the trial court allowed defense counsel to elicit testimony from Dr. Obayuwana about three prior incidents where he encountered shoulder dystocia in other patients but delivered the babies without causing injury. In his second assignment of error, Robinson claims that the trial court erred when it allowed this testimony.

{¶ 43} On direct examination, defense counsel asked Dr. Obayuwana to describe for the jury "prior experiences that [he has] had with very difficult shoulder dystocia deliveries that [he has] dealt with and succeeded in delivering[.]" Counsel for Robinson immediately objected on relevance grounds, and defense counsel responded that the testimony was relevant to refute Robinson's contention that Dr. Obayuwana panicked when he encountered shoulder dystocia during Ishonda's delivery. The trial court allowed the testimony. Dr. Obayuwana then went on to describe in detail three prior deliveries complicated by shoulder dystocia and the specific maneuvers employed to resolve the condition.

{¶ 44} The first delivery about which Dr. Obayuwana testified allegedly took place while he was at Adventist Hospital in Bethesda, Maryland. He recalled that the patient's husband and mother were present, as well as two to three nurses. He said that when he encountered the shoulder dystocia, he first tried a maneuver called McRoberts, then tried another maneuver called Woods screw, and then yet another maneuver called Rubin. He said that after these three maneuvers proved unsuccessful, he performed a

17.

proctoepisiotomy and a posterior arm extraction, ultimately delivering the baby without injury.

{¶ 45} The second delivery described by Dr. Obayuwana took place at Virginia Medical School. He said that he was called to help a mid-wife and the mid-wife's supervising physician. Dr. Obayuwana recalled that they had attempted the McRoberts maneuver, then the Rubin. When these maneuvers failed, they looked to Dr. Obayuwana for guidance. He performed a maneuver called an axillary manipulation, or Menticoglou, and succeeded in delivering the child without injury. He described the surprise of the residents, students, and attending physicians who witnessed him perform this lesser-known maneuver.

{¶ 46} Dr. Obayuwana did not specify where the third delivery took place, but he recounted being called by a patient's physician who encountered difficulty during delivery. The baby's head was delivered, the physician performed downward traction, and the cord was around the baby's neck. The doctor clamped the cord in two places and cut it, a risky decision because the baby is no longer being supplied with oxygen. The physician then discovered that the baby's shoulder was stuck. He tried the McRoberts, Rubin, Woods screw, and posterior shoulder maneuvers to no avail. These maneuvers having failed, the doctor pushed the baby's head back in and intended to perform a C-section, a time-consuming prospect that could result in damage to the baby. At this point, Dr. Obayuwana suggested putting the patient on her hands and knees—a Gaskin maneuver. Once again, Dr. Obayuwana successfully delivered the baby without injury.

18.

Ultimately, Dr. Obayuwana was permitted to testify that he is aware of no cases where babies he delivered suffered a brachial plexus injury.

{¶ 47} Robinson argues that this evidence was not relevant and its admission violated Evid.R. 403(A) and 404(B). He maintains that evidence of these prior incidents was offered only to show action in conformity therewith, a purpose prohibited by Evid.R. 404(B). He insists that even if relevant, Evid.R. 403(A) mandated the exclusion of the evidence because its probative value was substantially outweighed by the danger of unfair prejudice.

{¶ 48} Dr. Obayuwana responds that the trial court properly allowed Dr. Obayuwana to testify to prior shoulder dystocia deliveries because (1) the evidence was necessary to refute Robinson's claim that Dr. Obayuwana was inexperienced and had panicked during the delivery; (2) the evidence was not barred under Evid.R. 404(B) because it was offered to demonstrate knowledge and ability to assess shoulder dystocia and to act without panicking; (3) Robinson opened the door to the evidence by eliciting evidence that Dr. Obayuwana panicked and by questioning him about his prior experience in dealing with shoulder dystocia; (4) the evidence was admissible under Evid.R. 406 to show habit or routine practice, and the evidence here highlighted his regular practice of assessing a shoulder dystocia patient and identifying the maneuver best-suited to resolve it; and (5) Robinson cannot identify how he was unfairly prejudiced by the admission of the evidence because it did not arouse the jury's emotional sympathies, evoke a sense of horror, or appeal to an instinct to punish.

19.

## 1. Relevance

{¶ 49} Ishonda's cousin, Tierra, described that once A.J.'s head was delivered, Dr. Obayuwana's demeanor changed and he seemed panicked. She described: "He was clearly calm, confident in what he was doing. And once AJ's head popped out, he's just—what's the word—his demeanor just changed. It went—he became fearful. More anxious to really get the baby out." She said that he became very focused and concerned, his voice got deeper, and he became very serious. Alexander similarly testified that Dr. Obayuwana started to panic. Dr. Obayuwana argues that the evidence of other deliveries was relevant to dispute Robinson's claims that he was inexperienced and that he panicked during Ishonda's delivery.

{¶ 50} Robinson denies arguing that Dr. Obayuwana was inexperienced. He explains that it was not his position that Dr. Obayuwana did not *know* what to do when faced with a shoulder dystocia—it was that he did not *do* what he should have done. And although Robinson does not dispute that he offered testimony indicating that Dr. Obayuwana's demeanor changed and he appeared to panic, he maintains that it was for the jury to decide whether Dr. Obayuwana, in fact, panicked in *this* case, and whether his panic led him to use inappropriate force during A.J.'s delivery. He insists that evidence that Dr. Obayuwana safely delivered babies in other cases does not mean that he did not panic in the present case. Moreover, he argues, there was no way to independently verify the truth of Dr. Obayuwana's claims.

20.

{¶ 51} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is generally admissible, whereas "evidence which is not relevant is not admissible." Evid.R. 402.

{¶ 52} We agree with Robinson that evidence of other shoulder dystocia deliveries was not relevant and should not have been allowed. In the absence of testimony indicating that Ishonda's delivery was in all respects similar to these other deliveries (e.g., there was a second impaction at the sacral promontory, a baby with the cord wrapped around his neck twice, and a mother who did not have an epidural, poorly tolerated the pain of delivery, and moved up the bed with her baby's head protruding from her vagina), that Dr. Obayuwana successfully managed[1] these three other shoulder dystocia deliveries does not make it more or less probable that he did not panic and that he properly managed the shoulder dystocia encountered during Ishonda's delivery. Dr. Obayuwana could have rebutted Robinson's assertion that he panicked during delivery with testimony from his own witnesses—including Dr. Kopp,[2] Nurse Schade, and Dr.

---

[1] We observe that in two out of three of these prior deliveries, Dr. Obayuwana was not the attending obstetrician; he had been consulted to assist with the deliveries.

[2] Dr. Kopp actually acknowledged on cross-examination that there was a change in Dr. Obayuwana's demeanor at some point. Counsel for Dr. Obayuwana did not pose any questions to Dr. Kopp about Dr. Obayuwana's demeanor or whether he appeared to panic.

21.

Obayuwana himself—that he did *not* panic during the delivery. He was not free to rebut Robinson's assertions with unverifiable information about unrelated prior deliveries involving different facts and circumstances. Simply put, Dr. Obayuwana's testimony regarding all of his successful deliveries involving shoulder dystocia was not probative of the relevant issue: Dr. Obayuwana's demeanor in Ishonda's delivery room when presented with the unique circumstances at issue in this case.

{¶ 53} We find that these other purportedly successful deliveries were not relevant to refute Robinson's contention that Dr. Obayuwana panicked during Ishonda's delivery. The trial court erred in failing to exclude this evidence.

## 2. Evid.R. 404(B)

{¶ 54} While we have already determined that the evidence of prior deliveries was not relevant, and, therefore, not admissible, we also address Robinson's argument that the evidence was barred under Evid.R. 404(B). He contends that just as evidence of prior instances of alleged malpractice is inadmissible to show that a physician was negligent with respect to a plaintiff's care, so too is evidence of prior instances offered to show that the physician was *not* negligent. Dr. Obayuwana responds that the evidence of other acts here was admissible to show his knowledge and ability to assess shoulder dystocia during a delivery without panicking. He claims that Robinson opened the door to this testimony with evidence that Dr. Obayuwana appeared panicked.

{¶ 55} Evid.R. 404(B) provides, in pertinent part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show

22.

action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 56} Robinson correctly points out that in *Malcolm v. Duckett*, 2013-Ohio-2806, 996 N.E.3d 988 (6th Dist.), we found that evidence proffered by the plaintiff of other instances where the physician-defendant made mistakes similar to those forming the basis for her claim of malpractice was properly excluded under Evid.R. 404(B). In *Malcolm,* the plaintiff alleged that the defendant-surgeon caused a bowel perforation (an enterotomy) and failed to recognize it, resulting in severe infection. She sought to present evidence of other instances where the surgeon had done the same thing. She insisted that the information was being offered not to establish that prior acts of malpractice made it more probable that the surgeon had been negligent in her care, but to show that the surgeon did not practice with the same degree of care as the physicians represented in studies described by the surgeon's expert witness.

{¶ 57} We held that (1) evidence of other unrecognized enterotomies did not tend to make it more or less probable that the surgeon perforated plaintiff's bowel without recognizing it unless the other patients presented with substantially similar medical histories, symptoms, complaints, etc., and were in all other ways substantially the same; (2) in the absence of a credible allegation that the surgeon intentionally caused and failed to recognize a perforation, prior enterotomies would not establish "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

accident," as required for its admission under Evid.R. 404(B); and (3) the evidence was inadmissible under Evid.R. 403(A) because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

{¶ 58} As we recognized in *Malcolm,* the Second District has held similarly. In *Lumpkin v. Wayne Hospital,* 2d Dist. No. 1615, 2004-Ohio-264, the plaintiff intended to present evidence that the surgeon who allegedly transected her bile duct during gall bladder surgery had made an identical mistake in a surgery performed on another patient. Plaintiff claimed that this demonstrated that the physician was on notice that his surgical technique was flawed. The court held that plaintiff failed to proffer evidence establishing that the circumstances of the prior occurrence were substantially similar to the circumstances of her surgery. It concluded that the evidence was properly excluded.

{¶ 59} Dr. Obayuwana claims that *Malcom* is inapplicable here because in *Malcolm*, the evidence was offered to bolster the plaintiffs' claim that the physician had been negligent by offering evidence of complications suffered by the physician's other patients, whereas here, the evidence was offered to rebut Robinson's "strategically crafted trial theme" that Dr. Obayuwana was inexperienced with shoulder dystocia and simply panicked. Robinson counters that past-acts evidence is not permissible to demonstrate a "general fund of knowledge regarding medical practices." He again denies having attacked Dr. Obayuwana's knowledge base or having claimed that Dr. Obayuwana was inexperienced. He emphasizes that his position was not that Dr.

24.

Obayuwana did not *know* what to do when faced with a shoulder dystocia—it was that he did not *do* what he should have done.

{¶ 60} Despite Dr. Obayuwana's characterization to the contrary, it is clear from Dr. Obayuwana's closing argument that the purpose of offering evidence of those other deliveries was to show action in conformity therewith:

> You heard yesterday Dr. Obayuwana in exquisite detail describe the three worst shoulder dystocias that I think he's ever had in his life. Much more difficult than this one to manage.
>
> In one case I remember he telling you about another doctor having been involved. I think maybe in that case there was a midwife involved. They were so at a loss, they were going to try this extreme measure of a Zavanelli maneuver where they basically just give up on delivering the child from below, out the vagina and they want to push the baby's head up back into the womb and do a C-section. And Dr. Obayuwana explained how risky and extreme that is. And what did Dr. Obayuwana do when he got to the room? I think that was the case in which he remembered this pretty obscure maneuver called the Menticoglou. What I do vividly remember is that he explained that he came up with another maneuver and it worked. This baby was not forced back up into the womb. This baby was saved from brain damage.

And Dr. Obayuwana by cool, calm thinking, deep knowledge, saved that baby.

He told you about another case in which it was one of his posterior arm extractions. And he explained to you how that was actually a more difficult posterior arm extraction because he explained to you that sometimes the arm is flat against the baby's side. Sometimes it's like on the abdomen and sometimes it's on the chest. And in that case, it was more difficult because it was on the abdomen and so he had to get the arm bent more before he could grab the wrist and pull the arm out.

And he contrasted it to this case as being relatively easy because the hand was up here on the chest. There was quit [sic] a bit of flex already at the elbow and all he needed to blindly locate where the arm was, what the configuration it was in, and was able to just deliver the arm.

And thirdly, he told you about another crisis that he got pulled into and that was a situation where they tried a bunch of maneuvers. Nothing worked. And he thought the best thing under those circumstances was this what he called the Gaskin maneuver, where with a cooperative mother, he was able to get the mother on all fours. Hands and knees. And that released the shoulder dystocia.

Does – how for the love of anything fair can they claim that such a man when confronted with this shoulder dystocia, he panicked; he didn't know what to do?

* * *

[Robinson's counsel] asked Dr. Gurewitsch to assume nothing was done other than just pull the baby out. Dr. Gurewitsch was asked to assume that Dr. Obayuwana panicked. How can it be possible that a doctor in these three prior much more complicated shoulder dystocias figured out what the other doctors weren't even able to figure out and save those babies just like he saved this baby?

{¶ 61} These statements at closing argument make clear that the evidence of prior deliveries was offered not to show knowledge, but to show that Dr. Obayuwana successfully managed other "much more difficult" and "much more complicated" shoulder dystocia cases and, therefore, it can be inferred that he successfully managed the shoulder dystocia in the present case, which was "relatively easy" by comparison. That is, the evidence was offered to show that Dr. Obayuwana "save[d] those babies just like he saved this baby."

{¶ 62} The evidence was therefore inadmissible under Evid.R. 404(B), and the trial court abused its discretion in admitting Dr. Obayuwana's testimony.

### 3. Evid.R. 403

{¶ 63} We have already determined that evidence of other shoulder dystocia deliveries performed by Dr. Obayuwana was irrelevant and improper under Evid.R. 404(B). But Evid.R. 403(A) also required its exclusion.

{¶ 64} Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Moreover, "even if a court finds that the other acts evidence was offered for a valid purpose under Evid.R. 404(B), the court must still consider whether the evidence is substantially more prejudicial than probative[.]" *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 47.

{¶ 65} In at least two other cases involving medical malpractice claims premised on mismanagement of shoulder dystocia, we found that Evid.R. 403(A) precluded other-acts evidence. In *House v. Swan,* 6th Dist. No. L-09-1232, 2010-Ohio-4704, plaintiffs alleged that the defendant-obstetrician caused a brachial plexus injury when he mismanaged a shoulder dystocia during delivery. Plaintiffs sought to introduce evidence of the obstetrician's prior similar errors. We concluded that the trial court properly excluded this evidence because its probative value was substantially outweighed by the danger of unfair prejudice under Evid.R. 403(A).

{¶ 66} In *D'Amore v. Cardwell,* 6th Dist. No. L-06-1342, 2008-Ohio-1559, the trial court had granted the defendant physician's motion in limine to preclude testimony

28.

of permanent brachial plexus injuries suffered by other children delivered by the defendant-obstetrician. We held that the trial court was within its discretion under Evid.R. 403(A) to exclude evidence of two pending malpractice claims because there had been no finding of negligence in either of those cases and consideration of the other negligence claims would have been highly prejudicial and would have risked confusing the issues for the jury.

{¶ 67} The Second District held similarly in *Lumpkin,* 2d Dist. No. 1615, 2004-Ohio-264, at ¶ 23. There the court found that even if the plaintiff had established that the circumstances of her surgery were substantially similar to a case where the defendant had made a prior surgical mistake, the evidence would have been excluded under Evid.R. 403(A) because "[p]roof of one bad result in a previous, similar surgery, without more, promotes an improper inference that because a doctor has had one bad result on a previous occasion, the doctor is incompetent."

{¶ 68} We reach the same conclusion here. Evidence that Dr. Obayuwana successfully managed shoulder dystocia deliveries in the past would promote an improper inference that he did so in the present case. Evid.R. 403(A) mandated exclusion of the evidence.

### 4. Evid.R. 406

{¶ 69} Finally, Dr. Obayuwana contends that the evidence of the prior deliveries was admissible under Evid.R. 406 as evidence of habit. Evid.R. 406 provides, in pertinent part, that "[e]vidence of the habit of a person * * *, whether corroborated or not

29.

and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person * * * on a particular occasion was in conformity with the habit * * *." "A habit is defined as a person's regular practice of meeting a particular kind of situation with a specific type of responsive conduct." *Mulford-Jacobs v. Good Samaritan Hosp.*, 1st Dist. Hamilton No. C-950634, 1996 Ohio App. LEXIS 5210, *6 (Nov. 20, 1996), citing McCormick, Evidence, Section 195 at 825 (4th Ed.Strong Ed.1992).

{¶ 70} The rationale for the admission of habit evidence is that "habitual acts may become semi-automatic and may tend to prove one acted in the particular case in the same manner." *Cardinal v. Family Foot Care Ctrs., Inc.*, 40 Ohio App.3d 181, 182, 532 N.E.2d 162 (8th Dist.1987). To be admissible as evidence of habit, the occurrence of the stimulus and the responsive behavior must occur frequently enough to constitute a pattern. *See Pappas v. Ippolito*, 177 Ohio App.3d 625, 2008-Ohio-3976, 895 N.E.2d 610, ¶ 28 (8th Dist.) ("Examples of habitual acts are locking the door of a house or traveling home from work by the same route every day."). "Evidence as to one or two isolated occurrences does not establish a sufficient regular practice for admission pursuant to Evid.R. 406." *Gerke v. Norwalk Clinic, Inc.*, 6th Dist. Huron No. H-05-009, 2006-Ohio-5621, ¶ 42, citing *Bollinger, Inc. v. Mayerson*, 116 Ohio App.3d 702, 715, 689 N.E.2d 62 (1st Dist.1996). To hold otherwise would defeat the purpose of Evid.R. 404(B) which prohibits the admission of other-acts evidence to show action in conformity therewith. *Cardinal* at 182.

30.

{¶ 71} Dr. Obayuwana maintains that the testimony about prior deliveries "highlighted his regular practice of assessing a shoulder dystocia and identifying the maneuver best suited to resolve the shoulder dystocia." He insists that the evidence was admissible to contradict Robinson's allegation that he panicked and began pulling on A.J.'s head rather than assessing the situation and performing the appropriate maneuver.

{¶ 72} Robinson does not dispute that Dr. Obayuwana properly identified that there was a shoulder dystocia—he complains that Dr. Obayuwana did not respond to it appropriately. Robinson also points to testimony by Dr. Obayuwana indicating that of 4,000 deliveries he has performed over a 30-year career, he has encountered only approximately five cases of shoulder dystocia. Robinson claims that Dr. Obayuwana cannot show habit based on only five out of 4,000 cases over 30 years.

{¶ 73} We find that this evidence is not admissible under Evid.R. 406 for a number of reasons. First, Dr. Obayuwana's testimony made clear that each shoulder dystocia presents a unique situation calling for an individual assessment of the circumstances, a reasoned decision as to the most appropriate maneuver to perform, and variation in how each mother and child responds to the maneuver. This suggests something other than a "semi-automatic" response to a repeated stimulus.

{¶ 74} Second, Dr. Obayuwana's testimony went well beyond simply explaining that he routinely assesses for shoulder dystocia and determines which maneuver to perform; he supplied very specific details about these three prior deliveries. Beyond the fact that each involved a shoulder dystocia, there was no suggestion that any of them

31.

presented the same challenges that he faced during Ishonda's delivery: e.g., a second impaction at the sacral promontory, a baby with the cord wrapped around his neck twice, and a mother who did not have an epidural, poorly tolerated the pain of delivery, and moved up the bed with her baby's head protruding from her vagina. Without some indication that the other deliveries presented these same challenges, we cannot say that Dr. Obayuwana exhibited responsive behavior to a repeated stimulus.

{¶ 75} Finally, Dr. Obayuwana testified himself that "[s]houlder dystocia is very rare." We agree with Robinson that five of 4,000 deliveries is too infrequent an occurrence to establish a sufficient regular practice necessary for admission under Evid.R. 406. Dr. Obayuwana's testimony about these prior deliveries was not proper evidence of habit.

### 5. Prejudice

{¶ 76} Dr. Obayuwana claims that even if evidence of other shoulder dystocia deliveries was improperly admitted, a new trial is not warranted because the result of the proceedings would have been the same.

{¶ 77} Civ.R. 61 provides that "No error in either the admission or the exclusion of evidence * * * is ground for granting a new trial * * * unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." In determining whether a substantial right of a party has been affected, "the reviewing court must decide whether the trier of fact would

have reached the same decision had the error not occurred." *Berger v. Berger*, 2015-Ohio-5519, 57 N.E.3d 166, ¶ 9 (11th Dist.), citing *Petti v. Perna*, 86 Ohio App.3d 508, 514, 621 N.E.2d 580 (3d Dist.1993).

{¶ 78} Dr. Obayuwana maintains that the jury's verdict hinged on his credibility and whether he performed a posterior arm extraction, and he insists that there was more than enough evidence to support the jury's conclusion that he did. But this was an issue of much debate. No one in the delivery room saw Dr. Obayuwana insert his hand into Ishonda's vagina to extract the arm, and there was competing evidence from eyewitnesses as to which way the baby was facing. The jury may well have swayed by the evidence of prior instances where Dr. Obayuwana employed various maneuvers to dislodge impacted shoulders.

{¶ 79} In addition to this, we observe that Dr. Obayuwana's examination concerning these prior deliveries was lengthy and detailed, and much emphasis was placed on this evidence during closing argument, further demonstrating its importance to his case. We cannot say that the jury's verdict would have been the same had the evidence been excluded or that Robinson's substantial rights were not affected by its admission. *See State v. Walls*, 6th Dist. Erie Nos. E-16-027, E-16-028, 2018-Ohio-329, ¶ 51 (finding that state's actions in emphasizing the improper testimony for the jury contributed to prejudice to defendant).

33.

**{¶ 80}** Accordingly, we conclude that the trial court abused its discretion in admitting Dr. Obayuwana's testimony concerning other shoulder dystocia deliveries, and we find Robinson's second assignment of error well-taken.

### C.  The trial court's denial of request to present rebuttal testimony.

**{¶ 81}** In his first assignment of error, Robinson argues that the trial court erred when it excluded rebuttal testimony offered to establish that what appeared to be bruising on A.J.'s right hand was not bruising at all, but rather, a birthmark.  He argues that the issue of this "bruising" and its significance was first presented in Dr. Obayuwana's case-in-chief when his expert, Dr. Landon, testified that the bruising must have occurred when Dr. Obayuwana reached in to grab A.J.'s right hand.  This was offered as proof that (1) Dr. Obayuwana delivered A.J.'s posterior right arm, and (2) Robinson's observation that A.J. was facing maternal right could not be true.

**{¶ 82}** Robinson sought to present testimony that while it initially appeared that A.J. had bruises on his arm and hand, these bluish spots did not disappear like a bruise would.  At some point Ishonda asked A.J.'s pediatrician about this and was told that the markings are a type of birthmark known as Mongolian spots that would fade over time; this is not documented in A.J.'s medical records, however.  Ishonda claimed that she discovered that this is a Pettaway family trait, and that both she and her other son had them as babies.  To rebut Dr. Landon's testimony that the bruising on A.J.'s right hand and arm proved that his right arm was posterior, Robinson asked that Ishonda and her mother be permitted to testify about these birthmarks on rebuttal.

34.

{¶ 83} Dr. Obayuwana objected to Robinson's proposed rebuttal evidence, arguing that the delivery nurses noted the bruising on A.J.'s skin, and no medical provider had made a diagnosis of Mongolian spots. He characterized Robinson's proposed evidence as testimony by lay witnesses who were not qualified to refute the original diagnosis that the discoloration on A.J.'s skin was bruising. Robinson countered that testimony that the discoloration persisted long after a bruise would have disappeared was not a medical opinion, but rather a mere observation that any lay person could make. Robinson proffered photographs for the court's review.

{¶ 84} The trial court reviewed A.J.'s pediatrician's records. It observed that while numerous skin issues were addressed in the records, the presence of Mongolian spots was never noted. The court took the position that testimony from Ishonda or Shevella about the continued presence of this discoloration would necessarily call into question the cause of the discoloration and invite improper lay testimony as to medical causation. Robinson asked to proffer Ishonda's testimony.

{¶ 85} The Ohio Supreme Court has recognized that "[a] party has an unconditional right to present rebuttal testimony on matters which are first addressed in an opponent's case-in-chief and should not be brought in the rebutting party's case-in-chief." *Phung v. Waste Mgt.*, 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1994). "Generally, the admission of rebuttal testimony is a matter within the trial court's discretion, and a decision admitting or excluding such testimony will not be reversed

35.

absent an abuse of that discretion." *Brothers v. Morrone-O'Keefe Dev. Co., LLC*, 10th Dist. Franklin No. 05AP-161, 2006-Ohio-1160, ¶ 6.

{¶ 86} Dr. Obayuwana contends that Robinson's rebuttal evidence was properly excluded because (1) Ishonda, as a lay witness, lacked the competence to testify as to the cause of the discoloration or the diagnosis of Mongolian spots; (2) Robinson offered no independent evidence that the nurse's note regarding the presence of bruising present immediately after A.J.'s delivery was inaccurate; and (3) Robinson first introduced the issue of A.J.'s bruising during their case-in-chief.

{¶ 87} Robinson maintains that the difference between a bruise and a birthmark is within the common knowledge of a lay witness and does not require medical testimony. While Ishonda and Shevella may not be permitted to testify that these markings were "Mongolian spots," they could properly testify to their observations of A.J.'s hand and wrist. Robinson denies that such testimony challenges the nurses' capability to distinguish between bruising and Mongolian spots. And while Ishonda testified that she saw bruising on A.J. after his delivery, it was Dr. Landon who first raised the significance of this bruising as evidence that a posterior arm extraction had been performed—an opinion he failed to disclose during his discovery deposition. Robinson claims, therefore, that rebuttal testimony should have been allowed.

{¶ 88} "[T]he issue to be resolved in considering whether medical evidence is required is whether the questions of cause and effect involve matters of common knowledge, or whether they involve scientific inquiry beyond the understanding of the

36.

average layman." *White Motor Corp. v. Moore*, 8th Dist. Cuyahoga No. 34185, 1975 Ohio App. LEXIS 7123, *8-9 (Oct. 30, 1975). Courts have held that the existence of a bruise is a matter within the common knowledge of the average layman. *Id.* at *10; *see also Reed v. MTD Prods., Midwest Indus.*, 111 Ohio App.3d 451, 462, 676 N.E.2d 576 (6th Dist.1996) (whether plaintiff suffered bruise to right arm as a result of accident was not a matter necessitating expert testimony); *State v. Higgins*, 12th Dist. Clinton No. CA91-10-023, 1992 Ohio App. LEXIS 2737, *12 (May 18, 1992) (that the victim suffered bruises on arms was a matter within the common, ordinary, and everyday knowledge of the average person).

{¶ 89} Here, Robinson asserts that "whether a bluish discoloration to the child's hand and lower arm was a bruise and behaved like a bruise is something that is clearly within the observational capacity and experience of a parent, who was present and able to observe the bluish discoloration at all times following birth." While we agree with this general proposition, the proffered testimony went beyond merely describing that the bluish discoloration on the baby's hand and arm did not disappear as a bruise normally would. Ishonda, in her proffered testimony, sought to explain the true cause of the discoloration. ("And my mom actually stated to me that they were Mongolian spots. And I was like, well, what is Mongolian spots? And she said that I had it when I was a child and that they were pretty much in the form of like discoloration of the – different parts of the skin.").

37.

{¶ 90} We agree with Dr. Obayuwana that rebuttal testimony suggesting that the discoloration was actually a congenital birthmark known as a Mongolian spot went beyond the everyday knowledge of an average person and crossed the line into medical opinion requiring expert testimony. Accordingly, we find that the trial court did not abuse its discretion in excluding Robinson's proffered rebuttal testimony.

{¶ 91} We find Robinson's first assignment of error not well-taken.

### IV. Conclusion

{¶ 92} We find that the trial court did not err when it excluded rebuttal evidence from Robinson to counter Dr. Obayuwana's expert's testimony that bruises on A.J.'s right hand was evidence that Dr. Obayuwana had performed a right posterior arm extraction. We find Robinson's first assignment of error not well-taken.

{¶ 93} We agree with Robinson that the trial court erred in allowing Dr. Obayuwana to testify to details concerning three specific instances where he safely delivered babies after encountering shoulder dystocia. We find his second assignment of error well-taken.

{¶ 94} And because he failed to raise the issue in his motion for a new trial, Robinson waived any error in the trial court's admission of Dr. Obayuwana's expert's opinions as to the effect of Ishonda moving up the hospital bed during delivery. We find his third assignment of error not well-taken.

38.

**{¶ 95}** We affirm, in part, and reverse, in part, the March 31, 2017 judgment of the Lucas County Court of Common Pleas. Because of our resolution of Robinson's second assignment of error, we find that his motion for new trial should have been granted. We, therefore, remand this matter for a new trial. The costs of this appeal, including the costs of transcripts, are assessed to Dr. Obayuwana under App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                                   _____
                                                     JUDGE

James D. Jensen, J.

                                      _____
Christine E. Mayle, P.J.                                         JUDGE
CONCUR.

                                      _____
                                                     JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.