[Cite as *Courtney v. Durrani*, 2025-Ohio-2335.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


ERIC COURTNEY,                          :          APPEAL NO.   C-240295
                                                   TRIAL NO.    A-1307859
    Plaintiff-Appellee,             :

  vs.                                   :

ABUBAKAR ATIQ DURRANI, M.D.             :          *JUDGMENT ENTRY*

  and                                   :

CENTER FOR ADVANCED SPINE              :
TECHNOLOGIES,
                                        :
    Defendants-Appellants.

MICHAEL KOELBLIN,                       :          APPEAL NO.   C-240296
                                                   TRIAL NO.    A-1506160
    Plaintiff-Appellee,             :

  vs.                                   :

ABUBAKAR ATIQ DURRANI, M.D.             :

  and                                   :

CENTER FOR ADVANCED SPINE              :
TECHNOLOGIES,
                                        :
Defendants-Appellants.

                                        :

This cause was heard upon the appeals, the records, the briefs, and arguments.

The judgments of the trial court are affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs are taxed under App.R. 24.

## OHIO FIRST DISTRICT COURT OF APPEALS

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 7/2/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| ERIC COURTNEY, | : | APPEAL NO. | C-240295 |
| | | TRIAL NO. | A-1307859 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| ABUBAKAR ATIQ DURRANI, M.D. | : | *O P I N I O N* | |
| and | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | | |
| | : | | |
| Defendants-Appellants. | | | |

| | | | |
|---|---|---|---|
| MICHAEL KOELBLIN, | : | APPEAL NO. | C-240296 |
| | | TRIAL NO. | A-1506160 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| ABUBAKAR ATIQ DURRANI, M.D. | : | | |
| and | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | | |
| | : | | |
| Defendants-Appellants. | : | | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: July 2, 2025

*Statman Harris LLC, Alan Statman*, *The Deters Law Firm, P.S.C.,* and *Benjamin M. Maraan II,* for Plaintiffs-Appellees,

*Taft Stettinius & Hollister LLP*, *Philip D. Williamson, Russel S. Sayre, Nathan R. Coyne* and *Aaron M. Herzig*, for Defendants-Appellants.

**KINSLEY, Presiding Judge.**

{¶1} Defendants-appellants Abubakar Atiq Durrani, M.D. and Center for Advanced Spine Technologies, Inc. ("CAST") (collectively "Durrani") appeal the judgments of the Hamilton Count Court of Common Pleas following jury verdicts in favor of plaintiffs-appellees Eric Courtney and Michael Koelblin.[1] Courtney and Koelblin sued after Durrani performed what they claim were medically unnecessary back surgeries. The jury awarded them each substantial monetary damages, including punitive damages.

{¶2} In this latest of many such appeals, we in part cover familiar territory. Consistent with our holding in *Jones v. Durrani*, 2024-Ohio-1776 (1st Dist.), we hold that there was no error in the trial court's decision to consolidate Courtney's and Koelblin's cases for trial. Courtney's and Koelblin's claims raised common questions of law and fact sufficient to support joinder under Civ.R. 42, and Durrani did not demonstrate that he was prejudiced by the joint trial. But, following our earlier opinions in *Stephenson v. Durrani*, 2023-Ohio-2500 (1st Dist.), *Bender v. Durrani*, 2024-Ohio-1258 (1st Dist.), and *Jones*, we hold that the trial court erred in admitting improper testimony about Durrani's supposed habit in advising patients and in issuing a jury instruction that Durrani's absence from trial gives rise to a negative inference. Because those errors were harmless, however, we affirm the trial court's judgments despite them.

{¶3} We also cover some new territory in these appeals. Durrani contends that the trial court erred in admitting the testimony of an expert who, at the time of trial, did not meet the active clinical practice standard required by Evid.R.

---

[1] We sua sponte consolidate the plaintiffs' two separate appeals into a single opinion and judgment because they raise identical arguments in both appeals.

601(B)(5)(b). Durrani is correct, at least as to the expert's work history. But the evidentiary standard was amended in July 2023 and made retroactive to cases like Courtney's and Koelblin's. Because the expert satisfied the amended standard, we hold that his testimony was admissible below.

{¶4} Durrani also argues that he was entitled to a jury instruction on contributory negligence. On another record, he may be. But because nothing at trial established that Courtney's and Koelblin's alleged negligence caused their ongoing pain and mobility limitations, the trial court did not err in denying the instruction.

{¶5} And lastly, Durrani contends that the trial court erred in permitting Courtney and Koelblin to recover past medical damages without joining the insurance companies who paid their medical bills. Because the trial court reasonably exercised its discretion in finding pretrial joinder of plaintiffs' insurers infeasible and because the trial court cured their absence by excusing Durrani's payment of those damages without adequate releases, we disagree.

{¶6} As a result, we see no prejudicial error in the record of Courtney and Koelblin's trial against Durrani. We accordingly overrule Durrani's assignments of error and affirm the judgments of the trial court.

### *Factual and Procedural History*

{¶7} In 2013, Courtney and Koelblin separately sued Durrani after he operated on their backs. Their complaints included claims for battery, negligence, negligent hiring, fraud, intentional infliction of emotional distress, informed consent, violation of the Ohio Consumer Sales Protection Act, and falsification. The crux of Courtney's and Koelblin's claims was that Durrani performed surgeries on them they did not need, causing them unnecessary pain and leaving them worse off than had they treated their conditions through nonsurgical interventions. Their claims were

ultimately joined for a jury trial.

**{¶8}** Prior to trial, Durrani filed a number of pretrial motions, including one in which he sought to join Courtney's and Koelblin's insurance companies to the extent they had claims for subrogation. Durrani also filed a motion in limine seeking to exclude evidence from trial. Critically, Durrani moved to limit the testimony of Dr. Zeeshawn Tayeb, a witness to be called by Courtney and Koelblin to testify about Durrani's habit in advising his patients about surgery. He also moved to preclude plaintiffs from asserting claims for past medical expenses because of the failure to join the insurers. In addition to filing pretrial motions, Durrani also submitted proposed jury instructions, which included a request for a contributory negligence instruction and modified language for an adverse inference instruction about Durrani's absence from trial. The trial court deferred ruling on the motions until trial.

**{¶9}** Courtney and Koelblin's consolidated trial against Durrani began on September 8, 2021 and lasted six days.

### *Courtney's and Koelblin's Evidence*

**{¶10}** Courtney, who had experienced back and leg pain since 2009, testified first. He sought treatment for these conditions from Durrani beginning on October 1, 2012. Durrani initially recommended that he receive two injections, but Courtney only received one, as the doctor who administered the injections was not available for the second procedure. When the single injection did not bring Courtney lasting pain relief, Durrani recommended back surgery. According to Courtney, Durrani did not discuss the specifics of the surgery or its risks, nor did Durrani review his diagnosis with him. But Durrani did advise him that surgery would "fix it" and that "it's easy."

**{¶11}** On December 9, 2012, Durrani conducted a lumbar hemilaminectomy, foraminotomy, and L5-S1 decompression on Courtney. Courtney admitted that he did

not read the post-surgical discharge instructions. The day after his discharge from the hospital, he awoke in excruciating pain and visited the emergency room ("ER"). After being released from the ER, Courtney saw Durrani to obtain pain medication and steroids. At a follow-up visit two weeks after surgery, Courtney's pain was still worse than it was before surgery.

{¶12} Durrani advised Courtney to engage in post-operative physical therapy. Courtney saw the physical therapist on January 2 and January 4, 2013. During these visits, he communicated his desire to return to his job as a welder as soon as possible. Courtney admitted that he did not complete the recommended course of physical therapy, stopping after two visits because he perceived it to be ineffective.

{¶13} Courtney received a note from Durrani that allowed him to return to work for half-days on January 7, 2013 with restrictions on lifting. Consistent with Durrani's note, Courtney started back to work at that time. But Courtney lost his job just a few weeks later on January 28, 2013. He struggled both to attend work and to complete his job duties due to his ongoing back pain. Courtney did not see Durrani after he was fired from his job, because he lost his health insurance.

{¶14} Courtney told the jury that the surgery left him in a worse condition than he was in before seeking treatment from Durrani. He described his significantly diminished quality of life, significant functional impairments, and inability to be employed as a welder.

{¶15} Koelblin described a similar experience. Like Courtney, Koelblin had been experiencing back and leg pain, although for a much longer period of time. Koelblin's condition began in 1988. Koelblin initially saw Durrani on November 1, 2012. At this visit, Durrani recommended back surgery, stating that he could "fix" him.

8

**{¶16}** Koelblin had been to many doctors over the years and wanted more than temporary relief from his pain. But Durrani did not provide Koelblin with information about the surgical procedure he planned to perform and "ignored the question" when Koelblin asked him about the risks. Durrani advised Koelblin that he would be confined to a wheelchair in the future if he did not receive surgery. About the surgery, Durrani also said "[Y]ou'll shake my hand before you leave the hospital and tell me that you're feeling better," and that Koelblin would "be back to being a normal 40-year-old man."

**{¶17}** On April 19, 2013, Durrani performed the same surgery on Koelblin that he performed on Courtney: a lumbar hemilaminectomy, foraminotomy, and decompression in the L5-S1 area. An additional procedure on the L4-L5 area was initially planned but was not performed. Koelblin testified there was no discussion about the change. Immediately after surgery, Koelblin experienced "excruciating" pain on his right side, the opposite side of where he felt pain prior to surgery. He called Durrani's office and was told that his recovery sounded normal.

**{¶18}** Koelblin saw Durrani approximately six weeks after surgery. But his concerns about his level of pain and subsequent complaints of numbness were ignored, and he was only prescribed steroids. Koelblin did not see Durrani after this visit, because Durrani was out of town. Instead, he followed up with his primary care physician. He took pain medication for years after surgery to manage his back pain but discontinued the medicine in 2018 because he disliked the side effects.

**{¶19}** Koelblin was involved in an accident with a Bobcat machine in 2013 after he returned to work. He agreed that the Bobcat incident caused him some neck and upper back pain separate from the pain he experienced from the surgery.

**{¶20}** Koelblin testified that his daily pain was worse after surgery, that the

9

surgery significantly diminished his enjoyment of life, and that he was no longer able to perform physical labor for his job, cutting his income in half.

{¶21} Courtney and Koelblin called three physicians to testify in support of their claims. The first was Dr. Keith Wilkey. Dr. Wilkey, an othopedic surgeon, had essentially treated patients full-time until July 2020, when Covid restrictions led to the loss of his position. Dr. Wilkey agreed that he was not in active clinical practice at the time of trial. Instead, he was employed by an insurance company to review records, assess the necessity of surgery, and testify in court proceedings. As of the time of trial, Dr. Wilkey was in discussions with a clinical practice to return to a surgical position, but had not yet accepted the job.

{¶22} Durrani objected to Dr. Wilkey's testimony on the grounds that he did not meet the active clinical practice standard in Evid.R. 601(B)(5)(b). That rule requires experts testifying on the question of liability in a medical claim case to devote at least 50 percent of their professional time to active clinical practice or instruction at an accredited school. As it existed at the time, the 50 percent standard was measured as of the time of trial. Dr. Wilkey did not meet the standard when he testified.

{¶23} The trial court nonetheless permitted Dr. Wilkey to testify. Relying on the Ohio Supreme Court's decision in *Celmer v. Rodgers*, 2007-Ohio-3697, it attributed Dr. Wilkey's inability to meet the Evid.R. 601(B)(5)(b) to the Covid-19 pandemic, not his own withdrawal from the profession. It therefore overruled Durrani's objection.

{¶24} Testifying for Courtney and Koelblin, Dr. Wilkey opined that the medical images of plaintiffs' anatomies were inconsistent with the diagnoses made by Durrani. According to Dr. Wilkey, Durrani misrepresented and exaggerated the plaintiffs' conditions to justify surgeries that were not indicated. Dr. Wilkey

additionally testified that, because of Durrani's misrepresentations, Courtney and Koelblin could not provide medically adequate informed consent and that the consent to surgery that they did provide did not comport with the standard of care.

**{¶25}** Dr. Wilkey also testified to specific mistakes that Durrani made in each plaintiff's case. With respect to Courtney, Dr. Wilkey opined that Durrani exaggerated Courtney's MRI and was negligent in recommending and performing Courtney's surgery. More specifically, Dr. Wilkey testified that Durrani struck Courtney's nerve with a surgical instrument during the operation. According to Dr. Wilkey, this was the likely cause of Courtney's post-surgical pain, ER visit, and subsequent permanent injury. Durrani also misrepresented Courtney's gender in his medical records.

**{¶26}** Dr. Wilkey acknowledged that Durrani referred Courtney to physical therapy and that Courtney only attended two sessions. But he explained that he does not routinely recommend post-operative physical therapy in the absence of an identified motor deficit. Thus, his opinion as to Durrani's malfeasance was not impacted by Courtney's post-surgical conduct.

**{¶27}** As to Koelblin, Dr. Wilkey testified that, in his opinion, Durrani was negligent in recommending and performing surgery and that the surgery permanently exacerbated what had previously been a relatively mild condition. Dr. Wilkey also opined that Koelblin provided inadequate informed consent to Durrani to operate.

**{¶28}** After reviewing Koelblin's medical records, Dr. Wilkey was unable to explain why Durrani did not perform the L4-L5 procedure that had been planned. He also noticed other anomalies in Koelblin's records. For example, one of Durrani's initial diagnoses was inexplicably missing from the operative report. Similarly, the side of the problem noted in the operative record was the opposite of where Koelblin had reported pain. Even more concerning, the name of another patient, McClure,

repeatedly appeared in Koelblin's medical records. McClure's actual records were nearly identical to Koelblin's operative report, making it difficult for Dr. Wilkey to discern whether Koelblin's records actually pertained to him.

**{¶29}** Dr. Wilkey agreed that Koelblin did not complete the physical therapy that Durrani recommended. But this did not change his opinion about Durrani's negligence.

**{¶30}** Courtney and Koelblin also called Dr. Ranjav Saini, a neuroradiologist. Dr. Saini expressed the opinion that Durrani's impressions of plaintiffs' medical histories and preoperative MRIs were incorrect and that Durrani exaggerated the radiology to perform surgeries that were not indicated. Dr. Saini additionally opined that informed consent cannot be provided for a surgery that is not medically necessary. Regarding Koelblin, he testified that the inclusion of McClure's records in Koelblin's file made it difficult to discern the details of the operative report. He also agreed with Dr. Wilkey that Koelblin's records failed to explain why Durrani abandoned the L4-L5 surgery just before the operation began.

**{¶31}** The final witness for Courtney and Koelblin was Dr. Zeeshan Tayeb, an interventional spine, pain and sports specialist who testified by deposition. Before Dr. Tayeb's testimony was read to the jury, Durrani objected and renewed the improper habit issue he previously raised in his motion in limine. The trial court overruled the motion and permitted the deposition to be read to the jury.

**{¶32}** In his deposition, Dr. Tayeb testified that, while working with Durrani, he heard Durrani say to patients that he would "fix" them and that they would be paralyzed if they did not consent to surgery. Patients also reported various comments that Durrani made to them: that their "head would fall off" if they did not consent to surgery, that they would be paralyzed, that they would not walk again, and that they

would lose control of their bowels and bladders without surgical intervention. He further testified that another physician, Dr. Shanti, advised him that Durrani was "overaggressive" in performing surgeries. Dr. Tayeb's view was that Durrani failed to properly treat his patients and often did not employ adequate conservative treatment prior to surgery, instead highlighting the high number of surgeries he was performing.

### *Durrani's Evidence*

**{¶33}** In his defense, Durrani presented the testimony of two medical experts: Dr. Michelle Whitman, a neuroradiologist, and Dr. Paul Kaloostian, a neurosurgeon. Dr. Whitman agreed with Durrani's impressions of Courtney's and Koelblin's histories and imaging and testified that, in her opinion, surgery was appropriate in both plaintiffs' cases. Dr. Whitman also testified that Courtney and Koelblin provided adequate informed consent.

**{¶34}** Dr. Kaloostian testified to similar opinions. Based on his review of plaintiffs' histories, imaging, and medical records, he opined that Durrani's recommendations were appropriate and met the standard of care, that surgery was in fact medically indicated for Courtney and Koelblin, and that both plaintiffs provided proper informed consent for their operations. He further testified that, in both cases, surgery was successful and that, according to their medical records, plaintiffs' pain levels improved after surgery.

**{¶35}** As to the inclusion of McClure's records in Koelblin's file, Dr. Kaloostian testified that Koelblin was not harmed by this error. As to Dr. Tayeb's testimony that Durrani advised patients they would be wheelchair-bound without surgery, Dr. Kaloostian admitted that nothing in plaintiffs' records indicated they might lose their ability to walk.

**{¶36}** Dr. Kaloostian also testified that, in general, physical therapy is

13

indicated after spinal surgery and that the failure to complete it can potentially cause chronic pain. This testimony was not specific to Courtney's and Koelblin's cases. He further opined that plaintiffs' ongoing pain was attributable to causes other than the surgeries that Durrani performed. As to Courtney, Dr. Kaloostian indicated that his rigorous work activities contributed to chronic muscle pain. As to Koelblin, Dr. Kaloostian pointed to his decades-long experience with pain prior to seeking treatment from Durrani as evidence of Koelblin's enduring injuries.

### *Jury Instructions and Verdicts*

**{¶37}** At the conclusion of the trial, the trial court instructed the jury. It rejected Durrani's request to include a comparative negligence instruction. And it included an instruction that Durrani's absence from trial gives rise to an inference that the evidence or testimony Durrani would have offered would have been unfavorable.

**{¶38}** On September 17, 2021, the jury issued verdicts in favor of both plaintiffs. The jury found in Koelblin's favor as to all of his claims against Durrani. It awarded him $629,781.92 in compensatory damages, $104,781.92 in past medical expenses, $75,000 in future medical expenses, $175,000 for past pain and suffering, $75,000 for future pain and suffering, $75,000 for past loss of enjoyment of life, and $125,000 for future loss of enjoyment of life.

**{¶39}** As to Courtney, the jury found that (1) Durrani was negligent in his care and treatment because he failed to meet the required standard of care; (2) Durrani failed to acquire informed consent; (3) Durrani committed battery by performing surgery; (4) the battery was the proximate cause of harm to Courtney; and (5) Durrani fraudulently misrepresented the necessity of the surgery. The jury did not find that Durrani's negligence, failure to receive informed consent, or misrepresentations were the proximate cause of Courtney's injuries.

**{¶40}** Courtney was awarded $337,804.88 in compensatory damages: $80,804.88 in past medical expenses, $20,000 in future medical expenses, $100,000 for past pain and suffering, $20,000 for future pain and suffering, $75,000 for past loss of enjoyment of life, and $42,000 for future loss of enjoyment of life.

**{¶41}** The jury also awarded each plaintiff $750,000 in punitive damages plus attorney's fees.

### *Posttrial Motions*

**{¶42}** After the jury reached its verdicts, Durrani moved for judgment notwithstanding the verdict ("JNOV") or, in the alternative, a new trial, arguing that (1) the trial court erred in refusing to issue a comparative negligence instruction; (2) the trial court erred by permitting plaintiffs to pursue claims for past medical expenses when they failed to join their insurers, who were the real parties interest; (3) the trial court erred in its adverse inference jury instruction; (4) the jury's verdicts were against the manifest weight of the evidence; (5) the trial court violated Evid.R. 601(B)(5)(b) in admitting Dr. Wilkey's testimony; (6) the trial court erred in admitting Dr. Tayeb's improper habit testimony; and (7) defendants were entitled to a setoff.

**{¶43}** The trial court denied Durrani's motion for JNOV or a new trial except as to his argument regarding past medical expenses. As to that issue, the trial court concluded that, under Civ.R. 19(A), Courtney's and Koelblin's insurance companies were the real parties in interest as to plaintiffs' claims for past medical expenses. It accordingly ordered that Durrani need not pay the past medical damages award to plaintiffs without obtaining adequate releases to avoid the potential of paying twice. The trial court also concluded that its admission of Dr. Tayeb's testimony and its absent defendant instruction were erroneous, but that these errors were harmless. In resolving Durrani's posttrial motions, the trial court also reduced Courtney's punitive

damages award from $750,000 to $675,609.76, to comply with the relevant statutory cap.

**{¶44}** Durrani has appealed.

### *Analysis*

**{¶45}** On appeal, Durrani raises three assignments of error. First, Durrani argues that the trial court should have ordered new trials with single plaintiffs, rather than trying Courtney's and Koelblin's claims together. Second, Durrani contends that the trial court erred in denying his motion for JNOV or a new trial. In support of this assignment of error, he presents a number of issues, including whether the trial court properly permitted the testimony of Dr. Tayeb and Dr. Wilkey and whether the trial court properly instructed the jury. Third, he argues that the trial court erred in allowing plaintiffs to pursue claims for past medical expenses at trial.

### *A. Joint Trial*

**{¶46}** In his first assignment of error, Durrani argues that the trial court erred by joining plaintiffs' claims before the jury. This is not the first time we have resolved a joint trial question in a case against Durrani. In *Jones*, 2024-Ohio-1776, at ¶ 25-26 (1st Dist.), we concluded that Civ.R. 42(A) permits the joinder of highly similar claims against Durrani, where the plaintiffs received similar surgeries, presented the testimony of similar medical experts on overlapping medical conditions, and raised common claims of malpractice and fraud based on the same legal theory. As in *Jones*, we review the trial court's decision to consolidate cases under Civ.R. 42(A) for an abuse of discretion. *Id.* at ¶ 20.

**{¶47}** Durrani presents essentially three arguments in support of his contention that the trial court abused its discretion in trying Courtney's and Koelblin's claims together. First, he argues that differences in Courtney's and Koelblin's injuries,

16

the duration of their pain, and their post-operative care render their cases inappropriate for joinder under Civ.R. 42(A). Second, he asks us to overrule *Jones*. Third, he contends that trying medical cases together is inherently prejudicial, such that Civ.R. 42(A) cannot be properly applied to them. None of these arguments are persuasive.

**{¶48}** To begin, Civ.R. 42(A)(1)(b) permits the consolidation of civil trials "[i]f actions involve a common question of law or fact." The common questions need not be identical. *Jones* at ¶ 26. In addition, the Civ.R. 42(A) consolidation standard does not take into account whether the joined actions have separate components or raise distinct factual or legal issues. *See, e.g., Clemente v. Gardner*, 2004-Ohio-2254, ¶ 18 (5th Dist.) (finding no abuse of discretion in trial court's consolidation even though cases presented questions of law and fact that were not in common). Nor does the rule weigh the proportion of a case that is in common against the proportion that is different in determining whether consolidation is appropriate. Rather, by the plain terms of the rule, a simple common question of law or fact is enough to support a joint trial. *See* Civ.R. 42(A)(1)(b).

**{¶49}** Here, common questions of law and fact supported trying Courtney's and Koelblin's actions together, and the trial court therefore properly exercised its discretion in conducting a joint trial. Courtney and Koelblin had similar diagnoses and received essentially the same surgery. They both advanced claims that Durrani made medically incorrect impressions of their images to order and perform surgeries that were not necessary. Through identical expert testimony, plaintiffs explained, in a detailed way, how the spine functions, the complexities of their conditions, and the surgeries Durrani performed. Because the cases need not be identical to warrant consolidation, the fact that Courtney's and Koelblin's claims were different in certain

17

factual respects is immaterial to the Civ.R. 42(A) inquiry. Thus, we reject Durrani's argument that differences in Courtney's and Koelblin's cases made joinder inappropriate under Civ.R. 42(A).

**{¶50}** We also reject Durrani's suggestion that *Jones* is bad law.[2] He argues for overruling *Jones* in large part based on the policy position that medical malpractice claims are uniquely individualized and therefore inappropriate for consolidation. He further contends that applying the Civ.R. 42(A) standard to doctors leaves them particularly vulnerable to prejudice. As Durrani contends, the impression left when one learns a doctor has been sued for malpractice by multiple patients is hard to overcome.

**{¶51}** In *Jones*, we rejected Durrani's argument that joinder of two plaintiffs' medical claims for trial was an abuse of discretion. *Jones*, 2024-Ohio-1776, at ¶ 23 (1st Dist.). The plaintiffs in *Jones* did not have identical histories, diagnoses or surgeries. *Id.* at ¶ 23-25. But the commonality in the facts of their medical procedures and conditions, the expert testimony necessary to prove their claims, and their legal claims and theories against Durrani supported the trial court's exercise of discretion in scheduling a joint trial. *Id.* While outside the Civ.R. 42 standard, we noted in *Jones* that the jury's nonidentical verdicts in that case, following the trial court's reminder to consider each plaintiff's case on its own merits, reflected the jury's ability to reach verdicts in a consolidated action. *Id.* at ¶ 26.

**{¶52}** While Durrani might have a point about the implications of Civ.R. 42(A) on physicians, the rule does not exempt any particular claim or any particular class of defendants from its application. To the contrary, consolidation under Civ.R. 42(A) is

---

[2] The Ohio Supreme Court declined to review *Jones*. *See Jones v. Durrani*, 2024-Ohio-3313.

essentially a docket-management technique. It enables trial courts to join civil actions that present common factual or legal questions so they can be processed more efficiently. *See, e.g., In re Cletus P. & Mary A. McCauley Irrevocable Trust*, 2014-Ohio-5123, ¶ 16 (5th Dist.) (crediting trial court's desire to streamline litigation in Civ.R. 42 analysis). Unless or until Civ.R. 42(A) is amended to exclude medical claims against physicians from its joinder provision, we are duty-bound to follow it. We accordingly decline to overrule *Jones*.

**{¶53}** Durrani's final argument is one of prejudice. He contends that the trial court's decision to join Courtney's and Koelblin's claims for trial prejudiced the jury against him, because it heard evidence applicable to only one plaintiff's case in conjunction with trying the other plaintiff's case.

**{¶54}** Durrani preserved a general prejudice objection when the trial court determined that it would permit a large number of plaintiffs who had filed medical claims against Durrani to consolidate their cases for trial. This decision occurred in another action—*Densler v. Durrani*, Hamilton C.P. No. A-1706561 (Dec. 7, 2022). In *Densler*, Durrani objected to joint trials on the basis of nonspecific prejudice. But Durrani did not renew that objection in Courtney's and Koelblin's cases specifically, nor did he point to the source of any actual prejudice on the record below. We review Durrani's prejudice argument with its lack of preservation in mind.

**{¶55}** For the first time on appeal, Durrani presents two examples of claimed evidentiary prejudice. Regarding Koelblin, Durrani asserts that he was prejudiced because the jury heard testimony that Durrani incorrectly performed Courtney's surgery by making contact with a nerve. This evidence, in Durrani's view, would have prejudiced the jury's understanding of how Durrani performed Koelblin's surgery, because it would have been tainted by the notion that Durrani was a substandard

physician. Durrani also points to errors in both plantiffs' medical records—Courtney was misgendered, and Koelblin's records were commingled with another patient's. Durrani argues that these examples strongly implied to the jury that he copied and pasted medical notes, and that this damaging inference could not have been made if the cases were tried separately.

**{¶56}** Durrani is correct, insofar as he argues that prejudice might inform the Civ.R. 42(A) joinder inquiry. Federal courts examining a similarly-worded rule have included prejudice in the inquiry into whether consolidation is proper. *See, e.g., Gamboa v. Ford Motor Co.*, 381 F.Supp.3d 853, 866 (E.D.Mich. 2019) ("Once the threshold requirement of establishing a common question of law or fact is met, . . . [t]he court weighs the interests of judicial economy against the potential for new delays, expense, confusion, or prejudice." (citations omitted.)). And in *Siuda v. Howard*, 2002-Ohio-2292, ¶ 12 (1st Dist.), we considered the impact of consolidation on the jury in a medical case. While not finding such an impact to be prejudicial, this court did not foreclose the argument that prejudice impacts the propriety of joining medical malpractice claims for trial. *Id.* at ¶ 10-12.

**{¶57}** Prejudice can therefore be relevant in assessing joinder under Civ.R. 42(A). And, of course, any consolidation of trials will certainly result in some prejudice. But the mere fact that a defendant can articulate some degree of prejudice flowing from Civ.R. 42(A) consolidation is insufficient to undermine consolidation. Rather, a party claiming prejudice under Civ.R. 42(A) must demonstrate *unfair* prejudice. *See e.g. Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, (2001) ("Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.").

**{¶58}** Durrani has failed to do that here. The jury in Courtney's and Koelblin's

20

cases rendered different verdicts for each plaintiff, evidencing its ability to consider the evidence applicable to each claim and to treat each plaintiff's cases in isolation. On this record, we see no indication that the jury considered evidence admitted by Koelblin in deciding Courtney's case or vice versa. While the punitive damages awards were identical, "the purpose of punitive damages are to punish the tortfeasor and to deter similar conduct." *Whetstone v. Binner*, 2016-Ohio-1006, ¶ 15. Thus, while there might come a time when a defendant does establish prejudice in a Civ.R. 42(A) joinder case, no prejudice exists in this case.

**{¶59}** Therefore, the trial court did not abuse its discretion in ordering consolidated trials. We accordingly overrule Durrani's first assignment of error.

### B. *Judgment Not Withstanding the Verdict and/or New Trial*

**{¶60}** In his second assignment of error, Durrani challenges the trial court's decision denying his motion for JNOV or a new trial, identifying five alleged issues with the trial court's judgment. First, he asserts that the trial court erred in admitting Dr. Tayeb's testimony. Second, he contends that the trial court erred in allowing the testimony of Dr. Wilkey. Third, he asserts that the trial court erred in failing to give a comparative negligence instruction. Fourth, he asserts that the trial court erred by improperly instructing the jury on Durrani's absence. Lastly, rather than addressing the impact of each alleged error, he argues that the errors were not harmless and cumulatively deprived him of a fair trial.

**{¶61}** We review a trial court's decision on Civ.R. 50 JNOV motion de novo. *Hounchell v. Durrani*, 2023-Ohio-2501, ¶ 30 (1st Dist.). Under this standard, we take the evidence in the light most favorable to the nonmoving party and grant the motion if reasonable minds can come to only one conclusion, which is in favor of the moving party. *Id.* Civ.R. 59 governs motions for a new trial. We review a trial court's decision

on a motion for a new trial for an abuse of discretion. *Id.* at ¶ 31.

### 1. *Dr. Tayeb's Testimony*

**{¶62}** Durrani first takes issue with the admission of portions of Dr. Tayeb's testimony under Evid.R. 406. In specific, Dr. Tayeb testified by way of deposition that Durrani had a habit of advising his patients of the ill-effects of foregoing surgery in an effort to convince them to agree. According to Dr. Tayeb, Durrani would tell patients if they did not agree to surgery their heads would fall off, they would lose bladder and bowel function, and they would be paralyzed.

**{¶63}** We held this testimony to constitute improper habit evidence under Evid.R. 406 in *Stephenson v. Durrani,* 2023-Ohio-2500, ¶ 37 (1st Dist.), and *Densler v. Durrani,* 2024-Ohio-14, ¶ 18 (1st Dist.). This was because Dr. Tayeb failed to establish the proper foundation for how often Durrani gave this advice to patients. *Id.* On the records before us in those cases, we could not discern whether Durrani told "five [patients] or fifty" that they would face severe consequences if they turned down his services. *Stephenson* at ¶ 37. And this was insufficient to meet the standard of a pattern to establish a habit under Evid.R. 406. *Id.*

**{¶64}** The testimony admitted in this case from Dr. Tayeb's deposition as to Durrani's habit in advising his patients appears to be substantially the same as, if not identical to, the testimony admitted in *Stephenson* and *Densler*. Based on our precedent, we agree with Durrani that this testimony was admitted in error. *See Stephenson* at ¶ 37.

**{¶65}** But the error was harmless. In assessing whether an evidentiary error was prejudicial or harmless we reverse a trial court's judgment only when "the error affects the substantial rights of the adverse party or the ruling is inconsistent with

substantial justice." *Hounchell*, 2023-Ohio-2501, at ¶ 71 (1st Dist.). In considering the former standard, we assess whether the trier of fact would have reached the same decision if the evidentiary error had not occurred. *Id.*

**{¶66}** We believe it would have. In both *Stephenson* and *Densler*, the jury cited Dr. Tayeb's testimony in its interrogatories as a basis for its verdict. *Stephenson,* 2023-Ohio-2500, at ¶ 82 (1st Dist.); *Densler,* 2024-Ohio-14, at ¶ 20 (1st Dist.). Not so here. And, while Dr. Tayeb's testimony was certainly harsher in degree, other testimony in the record supported the notion that Durrani minimized the risks of surgery to Courtney and Koelblin—telling them he would "fix" them and that surgery is "easy"—and exaggerated the dangers of skipping it. For example, as Courtney testified, Durrani told him he would be wheelchair-bound without an operation. But as Dr. Kaloostian conceded, this was not an accurate assessment of his condition. Moreover, the trial below was lengthy, Dr. Tayeb was not the only physician witness, and his testimony was not a focal point.

**{¶67}** Under these circumstances, the jury's verdicts appear to have rested on evidence other than Dr. Tayeb's testimony. We accordingly conclude that the trial court's error in admitting portions of Dr. Tayeb's testimony under Evid.R. 406 was harmless.

**{¶68}** Durrani also takes issue with Dr. Tayeb's testimony as to Dr. Shanti's opinion. According to Dr. Tayeb, Dr. Shanti told him that Durrani was overly aggressive in recommending surgery. Unlike Dr. Tayeb's habit testimony, this portion of his deposition was admissible. As this court held in *Bender v. Durrani*, 2024-Ohio-1258, ¶ 78 (1st Dist.), Dr. Shanti's opinion could be properly admitted into evidence under Evid.R. 804(B)(3) as a statement against a party's interest, because Dr. Shanti was an agent of party-defendant CAST. We accordingly see no error in the trial court's

admission of this portion of Dr. Tayeb's deposition testimony.

## 2. *Dr. Wilkey's Testimony*

**{¶69}** Durrani next argues that the trial court erred in admitting Dr. Wilkey's testimony under Evid.R. 601(B)(5)(b), because he did not spend at least 50 percent of his professional time in active clinical practice or instruction at an accredited school. The version of Evid.R. 601(B)(5)(b) in place as of Courtney and Koelblin's September 8, 2021 trial measured Dr. Wilkey's compliance with this standard at the time of trial. *See* Evid.R. 601 (B)(5)(b) (effective July 1, 2021). As of that date, Dr. Wilkey had left his position as an orthopedic surgeon due to the Covid-19 pandemic. He was working for an insurance company and testifying as an expert witness. He provided no direct patient care. But prior to the onset of the pandemic, when Courtney's and Koelblin's complaints were filed, Dr. Wilkey spent 90 to 95 percent of his time operating on patients in a clinical setting. From his testimony and the admission of his curriculum vitae, we can trace his compliance with the active clinical practice standard from 2005 to the summer of 2020, fully encompassing the period of time when Durrani was advising, treating, and operating on Courtney and Koelblin.

**{¶70}** The trial court concluded that Dr. Wilkey could testify despite his technical noncompliance with the then-existing clinical practice standard contained in Evid.R. 601(B)(5)(b). It did so on the basis of *Celmer*, 2007-Ohio-3697. In *Celmer*, the Ohio Supreme Court upheld the trial court's admission of an expert witness who did not meet the clinical practice standard[3] "where the witness would have qualified . . . but for defense continuances and a stay of proceedings resulting from the insolvency

---

[3] At the time *Celmer* was decided, the clinical practice standard was contained in Evid.R. 601(D). *Celmer* at ¶ 16.

of a [third party]." *Id.* at ¶ 25. It concluded that the trial court properly exercised its discretion because the expert met the standard "at the time the cause of action accrued, at the time of filing suit, and during the first three years of th[e] litigation" and because the expert would have continued to meet the standard if "the [trial] court commenced trial as originally scheduled." *Id.* at ¶ 26.

**{¶71}** The Ohio Supreme Court subsequently limited the holding in *Celmer* to its facts in *Johnson v. Abdullah*, 2021-Ohio-3304. At issue in *Johnson* was whether a physician employed in an administrative position who does not directly oversee other doctors engaged in active patient care may testify as an expert under Evid.R. 601(B)(5)(b). *Id.* at ¶ 1. Answering that question in the negative, the Court emphasized that, as written, the active clinical practice standard is assessed at the time the testimony is offered at trial. *Id.* at ¶ 24. And it declined to extend the *Celmer* exception to instances where an expert may have previously satisfied the professional practice standard, but no longer complied at trial. *Id.* at ¶ 23. Doing so, it said, would effectively rewrite the rule. *Id.*

**{¶72}** Interestingly, the rule was actually rewritten in July of 2023, with the express intention of neutralizing *Johnson*.[4] The amended rule now assesses an expert's compliance with the active clinical practice standard "at either the time the negligent act is alleged to have occurred or the date the claim accrued." *See* Evid.R. 601(B)(5)(b) (effective July 1, 2023). The current version of Evid.R. 601(B)(5)(b) therefore permits experts to testify based on their professional practice as of the time of the alleged medical negligence, not as of the time of trial.

---

[4] The staff notes to the rule amendment confirm that the rule was changed in response to the Ohio Supreme Court's decision in *Johnson*. *See* Evid.R. 601, Staff Notes ("[d]ivision (B)(5)(b) is amended to clarify the time at which the active clinical practice requirement is needed to qualify the witness as an expert witness, in response to the Supreme Court of Ohio's ruling in *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304").

**{¶73}** Thus, the admissibility of Dr. Wilkey's testimony squarely turns on which version of Evid.R. 601(B)(5)(b) applies. If the version of the rule in place at the time of trial governs, the trial court's decision was incorrect. *Johnson* limited *Celmer* to its facts, and the trial court could not rely on *Celmer* in creating a Covid-19 exception to the active clinical practice standard. On the other hand, if the current version of the rule applies, the trial court did not err in permitting Dr. Wilkey to testify, as he was essentially operating on patients full-time as of the date of plaintiffs' surgeries.

**{¶74}** The Ohio Rules of Evidence conclusively resolve this question. Pursuant to Evid.R. 1102(Y), the current version of Evid.R. 601(B)(5)(6) applies to all proceedings pending at the time of the July 2023 amendment unless application to pending cases "would not be feasible or would work injustice, in which event the former procedure applies." Courtney's and Koelblin's cases were pending in the trial court as of July 1, 2023, when the amended version of the active clinical practice standard was adopted. Therefore, according to Evid.R. 1102(Y), the amended rule applies to this proceeding, and the trial court did not err in permitting Dr. Wilkey to testify.

**{¶75}** Although not grounding his argument in the language of Evid.R. 1102(Y), Durrani suggests that it would be unfair to apply the amended evidentiary standard to Dr. Wilkey. But we think otherwise. If we were to agree with Durrani and apply the former standard, Dr. Wilkey could clearly testify on remand in accordance with the now-applicable amended rule. Thus, the remedy Durrani seeks—a new trial under the applicable Evid.R. 601(B)(5)(b) standard—is the very proceeding that already occurred. We decline to create such an absurd result.

### 3. *Jury Instruction Issues*

**{¶76}** Durrani next challenges two aspects of the trial court's jury instructions:

its failure to give a comparative negligence instruction and its instruction that Durrani's absence from trial gives rise to a negative inference.

**{¶77}** "We review a trial court's decision granting or denying a proposed jury instruction for an abuse of discretion. However, [t]he question of whether a jury instruction is legally correct and factually warranted is subject to de novo review." (Cleaned up.) *Jones*, 2024-Ohio-1776, at ¶ 29 (1st Dist.).

### a. *Comparative Negligence Instruction*

**{¶78}** Durrani requested that the trial court issue a comparative negligence instruction. He argued that Courtney's and Koelblin's failure to complete post-operative physical therapy and the demanding nature of their occupations at least in part caused their ongoing pain and suffering. The trial court denied Durrani's request, a decision Durrani now challenges. Because this issue raises a question of whether a comparative negligence instruction was legally warranted by the evidence presented at trial, we review the question de novo. *Id.*

**{¶79}** Ohio law recognizes the defense of contributory negligence in medical malpractice cases. *Viox v. Weinberg*, 2006-Ohio-5075, ¶ 13 (1st Dist.). If a plaintiff is contributorily negligent, his recovery from the defendant will be reduced according to the principles of comparative negligence. *Lambert v. Shearer*, 84 Ohio App.3d 266, 284 (10th Dist. 1992). To establish contributory negligence, the defendant must prove that the plaintiff breached a duty, proximately causing his own injury and combining and concurring with the defendant's conduct as an element without which the injury would not have occurred. *Segedy v. Cardiothoracic & Vascular Surgery Assoc. of Akron, Inc.*, 2009-Ohio-2460, ¶ 61 (9th Dist.).

**{¶80}** Specifically with regard to contributory negligence in medical malpractice cases, there must be some evidence that creates a causal connection

between the patient's negligence and the injury caused by the medical professional. *Viox* at ¶ 13. The patient's negligence must occur contemporaneously with, and not prior to, the physician's negligence. *Reeves v. Healy*, 2011-Ohio-1487, ¶ 71 (10th Dist.). Disregarding a doctor's orders can constitute contributory negligence, where there is evidence the patient's conduct proximately caused or contributed to his injuries. *Striff v. Luke Med. Practitioners, Inc.*, 2010-Ohio-6261, ¶ 57 (3d Dist.).

**{¶81}** The evidence presented at Courtney and Koelblin's trial did not warrant a comparative negligence instruction under these standards. Most lacking was any evidence that plaintiffs' failure to complete physical therapy or their return to demanding jobs proximately caused their ongoing pain and mobility limitations. In this context, Dr. Kaloostian testified that plaintiffs' activity levels before they sought treatment *may* have left them in ongoing muscular pain, but this was insufficient to establish proximate cause for the panoply of plaintiffs' post-surgical problems. These included not only muscle tension, but ongoing spinal injuries, debilitating spinal and limb pain, mobility limitations, and the inability to work. Neither Dr. Kaloostian nor any other expert testified that plaintiffs would not have suffered but for their decisions not to fully pursue physical therapy. And Dr. Kaloostian did not indicate that either plaintiff breached a duty in working so hard, such that they were negligent.

**{¶82}** There were also questions at trial about whether Courtney and Koelblin ever received Durrani's physical therapy referrals, such that they had a duty to attend. Durrani's notes indicate that he sent the information about physical therapy to other doctors, not to plaintiffs themselves. Presumably at least Courtney knew about Durrani's recommendation, because he attended two sessions of physical therapy. But on this record we are unsure whether Durrani established a duty on either plaintiffs' part to attend post-operative physical therapy. Nonetheless, even if he did, nothing at

28

trial attributed the proximate cause of Courtney's and Koelblin's conditions to the absence of physical therapy follow-up.

{¶83} "As the party asserting the affirmative defense, it was incumbent upon [Durrani] to present sufficient evidence to warrant the giving of the [contributory negligence] instruction." *Hacker v. Roddy*, 2013-Ohio-5085, ¶ 22 (3d Dist.). Because Durrani did not present adequate evidence of causation, the trial court properly declined Durrani's request for a comparative negligence instruction.

### b. *Absent-Defendant Instruction*

{¶84} Durrani also challenges the trial court's issuance of an absent-defendant instruction. He contends the language chosen by the trial court for this purpose—that Durrani's absence from trial "gives rise" to an inference that his evidence or testimony would be adverse to him—was improper.

{¶85} We found fault with an identical instruction in *Jones*, 2024-Ohio-1776, at ¶ 34 (1st Dist.). But we concluded the issuance of the instruction did not necessitate reversal, because the jury instructions as a whole did not mislead the jury on a matter affecting Durrani's substantial rights. *Id.* at ¶ 37-40.

{¶86} "In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole" for the purpose of determining whether the jury was likely to be mislead. *Id.* at ¶ 36. With regard to this instruction, it was not. While the trial court erroneously instructed the jury that Durrani's absence from trial affirmatively creates an inference that is adverse to him, it also informed the jury that the choice of making inferences from the evidence rested in its sound discretion. As we observed in *Jones*, this mitigated against the impact of the absent-defendant instruction, because the jury was not required to make the negative inference that instruction suggested. *Id.* at ¶ 37-40.

**{¶87}** Moreover, like in *Jones*, the record does not reflect that the jury was actually misled. It issued separate verdicts in Courtney's and Koelblin's cases that reflect its ability to understand the evidence to differentiate between the claims. We accordingly find no reversible error in the trial court's issuance of an absent-defendant instruction.

### c. Cumulative Error

**{¶88}** Durrani's final argument in support of his second assignment of error is that cumulative, nonharmless errors impacted the trial court's judgment denying his JNOV and new trial motion. We have identified two errors with that decision: (1) the improper admission of Dr. Tayeb's habit testimony, and (2) the issuance of an erroneous absent-defendant jury instruction. But, as we have explained, the jury instruction error did not constitute reversible error, and the admission of Dr. Tayeb's testimony was harmless.

**{¶89}** Under the cumulative error doctrine, a judgment may still be reversed if the cumulative effect of otherwise harmless errors deprives a party of a fair trial. *Woods v. Rogers*, 2024-Ohio-338, ¶ 51 (8th Dist.). We cannot describe the character of the two harmless errors we identified in this manner.

**{¶90}** Durrani's second assignment of error is accordingly overruled.

### C. *Past Medical Expenses and the Failure to Join Necessary Parties*

**{¶91}** In his third assignment of error, Durrani asserts that the trial court erred in permitted Courtney and Koelblin to recover monetary damages for their past medical expenses without joining as parties the insurance companies that actually paid those expenses.

**{¶92}** We established a framework in *Setters v. Durrani*, 2020-Ohio-6859, ¶ 53-58 (1st Dist.), for assessing Durrani's preservation of this issue. As we observed in

*Setters,* pursuant to Civ.R. 12(H)(2), a defense of failure to join a necessary party under Civ.R. 19 can be asserted in an answer, motion for judgment on the pleadings, or at trial. *Id.* at at ¶ 57. But merely raising a real-party-in-interest defense in an answer without taking affirmative action to further prosecute it results in waiver. *Id.*

**{¶93}** Unlike in *Setters*, where Durrani merely raised a cursory Civ.R. 19 issue in his answer and did no more, in this case Durrani filed a pretrial motion pursuant to Civ.R. 19(A) to join Courtney's and Koelblin's insurers and again raised the issue in his JNOV and new trial motion. *See id.* at ¶ 58. He therefore properly preserved the issue for our review. *See McCann v. Durrani*, 2023-Ohio-3953, ¶ 33 (1st Dist.).

**{¶94}** The trial court did not resolve Durrani's Civ.R. 19(A) joinder motion before trial. Instead, in its order denying Durrani's JNOV and new trial motion, it concluded that Courtney's and Koelblin's insurance companies were the real parties in interest to the past medical damages claims. But it held that their absence from trial was not fatal to the damages awards, as Durrani could obtain releases before making payment for past medical damages. It therefore ordered that Durrani need not pay the $80,804.88 the jury awarded for past medical expenses until such releases were executed. This mechanism, according to the trial court, would avoid the possibility of double payments to plaintiffs and their insurers. The trial court also noted that the timing of Durrani's motion, which was filed about a month before a trial date that had long been scheduled and involved the coordination of several medical experts' schedules, made pretrial joinder impractical.

**{¶95}** We see no error in this approach. Civ.R. 19(A) vests trial courts with considerable flexibility in determining when a party is necessary and when its appearance is feasible. *Walton v. Able Drywall Co.*, 2001 Ohio App. LEXIS 5154, *13 (2d Dist. Nov. 16, 2001). Here, given the rapidly approaching trial date and the

tardiness of Durrani's motion, the trial court did not act unreasonably in determining that joinder was infeasible.

**{¶96}** Moreover, the Ohio Supreme Court has advised that dismissal for the failure to join a necessary party is warranted "only where the defect cannot be cured." *State ex rel. Bush*, 42 Ohio St.3d 77, 81 (1989). Here, the trial court cured the insurers' absence from the trial by protecting Durrani from the risk of double damages. We noted in *McCann* that this is the core purpose of the real party in interest rule: to protect the tortfeasor from the risk of litigating multiple lawsuits and facing multiple judgments for the same damages. *McCann*, 2023-Ohio-3953, at ¶ 27 (1st Dist.). And in *McCann*, we approved mechanisms that protect that interest where joinder at trial under Civ.R. 19(A) may not, in the trial court's discretionary determination, be feasible. *Id.* at ¶ 33-34. We follow that approach again here.

**{¶97}** Durrani does not argue that plaintiffs' claims could not be adjudicated without the insurers, nor does he argue that he is unable to secure the releases the trial court ordered. Rather, he contends that the amount of Courtney's and Koelblin's past medical expenses should not have been included in calculating the statutory cap on punitive damages. But he does not otherwise assign error to the punitive damages award, and we decline to advance that argument for him. *See, e.g., Saylor v. Saylor*, 2020-Ohio-3647, ¶ 29 (1st Dist.) ("Appellate courts review assignments of error—we sustain or overrule only assignments of error and not mere arguments.").

**{¶98}** Durrani's third assignment of error is accordingly overruled.

### *Conclusion*

**{¶99}** Treading familiar ground, we uphold the jury's verdicts in Courtney's and Koelblin's favor on their medical claims against Durrani. The trial court did not err in trying Courtney's and Koelblin's claims together, in rejecting a comparative

negligence instruction, in permitting Dr. Wilkey to testify, and in declaring the joinder of plaintiffs' insurers on the eve of trial infeasible. Nor did it commit reversible error in admitting the testimony of Dr. Tayeb as to Durrani's habit in advising his patients or in instructing the jury on Durrani's absence from trial. We accordingly overrule Durrani's assignments of error and affirm the judgments of the trial court.

Judgments affirmed.

**CROUSE, J.,** concurs.
**BOCK, J.**, concurs separately.

**BOCK, J.,** concurring.

**{¶100}** Based on this court's holding in *Jones v. Durrani*, 2024-Ohio-1776 (1st Dist.), as well as Dr. Durrani's failure to raise a general prejudice argument below, I agree with the majority that the trial court did not abuse its discretion by joining Courtney's and Koelblin's trials. But I write separately because I believe that joining for trial separate professional-negligence claims against the same defendant creates an unacceptable risk of prejudice.

**{¶101}** The Ohio Rules of Civil Procedure allow a trial court to hold a joint trial when multiple "actions before the court involve a common question of law or fact." Civ.R. 42(A)(1)(a). In some situations, this makes sense. For example, when multiple parties to an identical contract sue for contractual damages and ask a factfinder to ascertain the meaning of an ambiguous clause, a joint trial carries little risk of prejudice. While the damages may be different, the clause's meaning would apply to any plaintiff alleging damages based on that clause. Likewise, if multiple people were injured by the same vehicle collision, none of the claims would survive if the fact finder determined that the alleged tortfeasor did not act negligently. In those situations, a single act exposes the defendant to liability.

**{¶102}** But in professional-liability lawsuits, where a jury must determine whether a licensed professional negligently performed a service, liability is based on the professional's unique interactions with unique individuals. Yet, joint lawsuits involving the same physician permit the factfinder to hear details about another pending malpractice action against the defendant doctor. Such evidence risks both jury confusion and a verdict based on improper propensity considerations.

### A. Ohio courts have determined that evidence of other malpractice cases is unfairly prejudicial

**{¶103}** Ohio courts, including this court, have held that evidence of prior or pending medical-malpractice claims against the same defendant doctor should be excluded because that evidence is unfairly prejudicial. *E.g., Stephenson v. Durrani*, 2023-Ohio-2500, ¶ 47 (1st Dist.), quoting *D'Amore v. Cardwell*, 2008-Ohio-1559, ¶ 97 (6th Dist.) ("[A]bsent a finding of malpractice, evidence of the existence of a prior medical malpractice case is properly excluded, as unfairly prejudicial."); *House v. Swann*, 2010-Ohio-4704, ¶ 53 (6th Dist.) (probative value of evidence involving the defendant-physician's previous, similar birth-injury incidents "was substantially outweighed by the danger of unfair prejudice."); *McGarry v. Horlacher*, 2002-Ohio-3161, ¶ 42-43 (2d Dist.) (evidence that the physician-defendant had previously misdiagnosed ovarian cancer was properly excluded because of the risk of unfair prejudice); *Lumpkin v. Wayne Hosp.*, 2004-Ohio-264, ¶ 23 (2d Dist.) (excluding evidence that the physician-defendant had committed similar malpractice in a separate lawsuit, noting, "Proof of one bad result in a previous, similar surgery, without more, promotes an improper inference that because a doctor has had one bad result on a previous occasion, the doctor is incompetent."); *D'Amore v. Cardwell*, 2008-Ohio-1559, ¶ 97 (6th Dist.) (excluding evidence of pending medical-malpractice

lawsuits because "[c]onsideration of other negligence claims, that remained to be proven, would have been highly prejudicial to [the physician] in this action and risked confusion of the issues for the jury in an already complicated case."); *Malcolm v. Duckett*, 2013-Ohio-2806, ¶ 17, 20 (6th Dist.) (even if the patient-plaintiff had offered evidence of previous malpractice actions against the physician-defendant for a permissible Evid.R. 404(B) purpose, it would have been excluded under Evid.R. 403(A) because the evidence "would certainly have caused unfair prejudice and would have confused and misled the jury.").

**{¶104}** Ohio's prohibition on admitting propensity evidence benefits both patients and physician-defendants. Evid.R. 404(A), which prohibits improper character evidence, states, "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Yet, joint professional-liability trials may be a trojan horse for such improper character evidence, the prejudicial effect of which is a two-way street. In *Robinson v. Mercy St. Vincent Med. Ctr.*, 2018-Ohio-2030, ¶ 61 (6th Dist.), the appellate court determined that an OBGYN-defendant's testimony and closing argument involving his shoulder-dystocia deliveries with good outcomes constituted improper propensity evidence. The court held that the physician offered this evidence to show that he had "successfully managed other 'much more difficult' and 'much more complicated' shoulder dystocia cases and, therefore, it can be inferred that he successfully managed the shoulder dystocia in the present case, which was 'relatively easy' by comparison." *Id.*

### B. *In other Durrani appeals, this court rejected attempts to introduce evidence of other lawsuits filed against Dr. Durrani*

**{¶105}** In *Stephenson*, this court explained that plaintiff's counsel introduced

35

a video collage, which contained excerpts of Dr. Durrani's various depositions. *Stephenson*, 2023-Ohio-2500, at ¶ 41 (1st Dist.). In addition to introducing prejudicial evidence that is not at issue in this case, the collage contained questions or references to five or more other malpractice lawsuits that had been filed against Dr. Durrani. *Id.* at ¶ 48. This court, quoting *D'Amore* at ¶ 97, stated, "Consideration of other negligence claims, that remain to be proven, would have been highly prejudicial to [defendant] in this action and risked confusion of the issues for the jury in an already complicated case." *Id.* Further, it held that because the collage did not attempt to show a correlation to the plaintiff's case, the collage's snippets of information about other malpractice cases "seems only to reinforce the point that Dr. Durrani is an incapable doctor." *Id.* at ¶ 50.

{¶106} Likewise, in *Hounchell v. Durrani*, 2023-Ohio-2501, ¶ 50-60 (1st Dist.), this court determined that including evidence of other lawsuits filed against Dr. Durrani permitted the plaintiff to introduce improper propensity evidence. This court noted that the evidence of other lawsuits Hounchell wished to introduce "was not related in any way to the surgery performed on Hounchell." *Id.* at ¶ 51.

{¶107} First, this court engaged in an Evid.R. 404(B) analysis and noted that evidence involving a party's previous crimes, acts, or wrongs is called "propensity evidence" because it tends to show that the defendant engaged in the accused wrongdoing in the instant case because the defendant previously had committed wrongful acts. *Id.* at ¶ 53. The *Hounchell* court rejected Hounchell's argument that evidence that Dr. Durrani failed to disclose previous lawsuits, despite having a duty to do so, was relevant to his credibility. *Id.* at ¶ 55. It held that no valid Evid.R. 404(B) basis justified admitting evidence of other lawsuits. *Id.* Indeed, the court noted that permitting this evidence to attack Dr. Durrani's credibility "looks exactly like the

propensity suggestion that Evid.R. 404(B) forbids by inviting the jury to infer that Dr. Durrani lied to Hounchell about the need for surgery since he supposedly lied about prior malpractice lawsuits on his license applications." *Id.* Further, the *Hounchell* court determined that the risk of prejudice "outweighed its very limited probative value." *Id.* at ¶ 56. The court determined that because the evidence did not relate to Dr. Durrani's treatment of Hounchell, it had been introduced "for the prejudicial purpose of asking the jury to infer that (1) because Dr. Durrani had been charged with malpractice in the past, he must have committed malpractice against Hounchell and (2) because Dr. Durrani had been dishonest in the past, he necessarily must have been dishonest when informing Hounchell about the findings on her medical images and about the medical necessity of surgery." *Id.*

### C. *Permitting joint trials in the cases against Dr. Durrani risks unfair prejudice*

**{¶108}** When a jury hears evidence that the same physician negligently treated two separate patients, the risk of juror confusion arises. And so does the risk of the jury basing its verdict on its belief that because multiple patients accused the physician of providing negligent treatment and fraudulently misrepresenting the need for surgery, the allegations must be true.

**{¶109}** This danger is exacerbated where, as here, multiple plaintiffs allege that the physician breached a duty of care in the same or similar way. When only one patient sues and asserts that a physician negligently performed surgery and caused injuries, the jury only considers whether the physician's treatment of that individual patient was negligent. But when multiple patients in a joint trial assert that a doctor was negligent by using the same surgical technique, that doubling up "promotes an improper inference that because a doctor has had one bad result on a previous

occasion, the doctor is incompetent." *Lumpkin v. Wayne Hosp.*, 2004-Ohio-264, ¶ 23 (2d Dist.).

{**¶110**} Here, both Koelblin and Courtney alleged that Dr. Durrani lied to them by misrepresenting their need for surgery. As stated in *Hounchell*, when evidence of other lawsuits filed against Dr. Durrani constitute an attack on his credibility, that evidence "looks exactly like the propensity suggestion that Evid.R. 404(B) forbids by inviting the jury to infer that Durrani lied to Hounchell about the need for surgery since he supposedly lied about prior malpractice lawsuits on his license applications." *Hounchell*, 2023-Ohio-2501, at ¶ 55 (1st Dist.).

{**¶111**} That Dr. Durrani gave Koelblin and Courtney similar diagnoses, performed similar surgeries, and allegedly lied to both about the need for surgery should not justify joining these cases. Ohio courts, including this court, have repeatedly held that permitting a plaintiff to introduce evidence of other medical-malpractice lawsuits involving the same physician constitutes unfair prejudice. Introducing such evidence risks the jury improperly determining that if the physician made a mistake treating one patient, it is more likely that the physician made a mistake treating the plaintiff. This improper inference seems more likely when the allegations of negligence—or fraud—involve similar medical treatment, outcomes, or misrepresentations.

{**¶112**} Jurors heard evidence that Dr. Durrani fraudulently misrepresented the need for surgery to two separate patients and negligently treated both patients in a similar manner. It is well-settled law in Ohio that permitting a patient to introduce evidence of pending medical-malpractice cases against a defendant doctor is unfairly prejudicial. The difference in this case—that the propensity evidence involved the other patient in a joint trial rather than a patient in a separate pending proceeding—is

irrelevant. Permitting evidence of other malpractice claims against the same doctor, regardless of how that evidence comes in, risks juror confusion and unfairly prejudices the physician. Ohio law forbids evidence of other bad acts because it leads to improper inferences. Here, jurors may have improperly inferred that because multiple patients made similar allegations against Dr. Durrani, the allegations must be true.

### D. Conclusion

**{¶113}** I am compelled to join the majority based on the precedent set by this court in *Jones v. Durrani*. But permitting the Koelblin and Courtney actions to be joined for trial created a real possibility that the verdicts were based not on Dr. Durrani's unique medical treatment of—and representations to—his two unique patients, but on juror speculation that multiple accusations of the same bad behavior make it more likely that the allegations in both actions were true.